THEODORE POTTS, PROSECUTOR, v. BOARD OF ADJUST-
MENT OF THE BOROUGH OF PRINCETON AND I. RUS-
SELL RIKER, ZONING OFFICER OF THE BOROUGH OF
PRINCETON, DEFENDANTS.

Submitted May 1, 1945—Decided September 14, 1945.

Before Justices DONGES, HEHER and COLIE.

For the prosecutor, *Louis Gerber* (*Sidney Goldmann,* of counsel).

For the defendants, *Edgar S. Smith* (*George Gildea,* of counsel).

The opinion of the court was delivered by

HEHER, J. Prosecutor challenges the action of the defendant board of adjustment in denying his application for leave to convert his single-family dwelling house designated as No. 80 Stockton Street, in the Borough of Princeton, into a two-family apartment house "within the present structure and framework of the dwelling." The house is located in a residential district ("Residence 'A'") zoned against two-family dwellings by a local ordinance enacted on January 17th, 1941, under *R. S.* 40:55–30, *et seq.*

This is the history of the proceedings before the zoning board, as shown by the board's minutes incorporated in the return to the writ of *certiorari:* On April 24th, 1944, prosecutor, by letter addressed to the board, made "application" for the desired permit, after the local building inspector had refused it. The letter was accompanied by a "sketch" showing that the proposed alterations would comply with the conditions of section 7(1) of the ordinance as to cubical content and exterior changes. The application came on for hearing at a regular meeting of the board held on May 15th, 1944, in the presence of prosecutor. The letter was read, and prose-

cutor "elaborated on his plans of making two apartments, one above the other, stating that while a portion of the house was about six inches from the east property line, it had always been that way;" and "it was brought out that the house was only about four feet from the one at 78 Stockton Street." After prosecutor stated that he had "nothing further to add," the board considered the matter in "executive session" and concluded that the application should be denied "on the grounds that it does not conform to the side-yard requirements of the ordinance." It was "pointed out" in the course of the executive conference that "houses in this neighborhood, especially on Edgehill Street, were nonconforming, some being very close," and that "if approval were given to this application it might start a run of applications for two-family apartments in this neighborhood, turning single houses with small side-yards into two-family apartments;" that the board "had turned down several applications for turning single houses into multiple family houses because of the lack of side-yard requirements, even in the 'B' District;" and that "side-yard requirements increase as the number of families increase." It was "generally agreed" that the approval of this application "would set a bad precedent." On the ensuing May 24th, a rehearing was had at a special meeting of the board, held at the instance of prosecutor. It was there contended by the latter's attorney that section 7(1) of the ordinance laid down no requirement as to side yards, and that the board "had no discretion except to grant the application once it was shown that the dwelling complied with section 7 as to cubical content and as to the absence of exterior alterations." The board here directed attention to the applicant's failure to provide "a plan drawn to scale, showing the proposed building in its exact relation to lot and street lines," as required by section 8(c) of the ordinance, notwithstanding that the omission had been brought to his notice, and he had promised to supply it. And it was observed by board members that there were "six or eight similar houses on Mercer Street and at least five or seven similar houses on Edgehill Street that would have just as much right as this house, and that they were hazardous;" that "about 60 residents of Residence 'A' District" had filed

a protest against "two-family houses in this district;" and that the board "had turned down 90% of the requests for conversion of single-family dwellings into two-family dwellings in order to preserve the general character of Princeton." The board again denied the application. It "considered the ordinance as a whole;" and it grounded its disapproving action upon the necessity of preserving "the general character of the neighborhood, the protection of property values and the consideration of public comfort and convenience."

No evidence was presented by prosecutor; nor did he offer evidence bearing upon the issues raised. The return to the writ of *certiorari* has been supplemented by depositions taken without leave of the court. Thereby it was sought to introduce issues not tendered in the proceeding before the board of adjustment; and this was improper, as will presently appear.

The fundamental point made by prosecutor is that the decision thus taken was arbitrary, unreasonable and discriminatory, in that it was "contrary to the express provisions" of the ordinance and the "intent and purpose thereof, as well as the intent and purpose" of the Zoning Act, and also transcended the provisions of the federal and state constitutions guaranteeing due process of law and the equal protection of the laws. Briefly stated, the matters adduced in support of this contention are that the board "had previously granted permission in the same Residence 'A' District for conversions to two-family apartment premises in at least five cases;" that a community clubhouse, used for teas, bridge parties, dances, art exhibits, and the like, and a "gift shop" are located in the same district, not far away; and that the Borough of Princeton is confronted with a "critical housing shortage" as a result of the recent establishment of industries nearby and the training of army and navy personnel at the university.

Prosecutor's brief terms his application for relief addressed to the adjustment board an "appeal" from the adverse action of the zoning officer, but it was not an appeal in the technical sense. He did not invoke the jurisdiction conferred by *R. S.* 40:55–39a, 40:55–39c or 40:55–39d (counsel considers these sections inapplicable), but rather the original jurisdiction granted by *section* 40:55–39b and section 7(1) of the ordi-

nance itself. The latter provision is that "With due consideration for preservation of the general character of the neighborhood, the Board of Adjustment may authorize the issuance of a permit" for the conversion of a dwelling in a "Residence 'A'" district (in existence when the ordinance was adopted) into a two-family dwelling house, upon condition that the "cubicle contents" of the building "shall not be less than 15,000 feet per family to be accommodated," and "there shall be no exterior alteration of building other than as may be required for purposes of safety." It is said that the authority thus bestowed "falls squarely within the statutory power given" by *section* 40:55–39b, and that the case in hand "falls squarely within" this provision of the ordinance. *Sections* 40:55–39a, 40:55–39c and 40:55–39d were incorporated in the terms of the ordinance which enumerate the powers of the Zoning Board, while *section* 40:55–39b was omitted. But jurisdiction to grant a "special exception" under subsection b is limited to the area abutting a district wherein the proposed use is permissible under the ordinance, for a distance of 150 feet from the boundary line. We find no reference in the testimony or the briefs to the location of the particular premises with relation to the district boundary line, but the zone map indicates the land is not in this area.

The functions of the local zoning board are delineated in the statute. The municipal governing body is empowered to create a board of adjustment; and it is directed to provide in the zoning regulations that such board "may in appropriate cases and subject to appropriate conditions and safeguards make special exceptions to the terms of the ordinance in harmony with its general purpose and intent and in accordance with general or specific rules therein contained." *Section* 40:55–36. In the specific enumeration of powers, these tribunals are authorized to "hear and decide special exceptions to the terms of the ordinance upon which such board is required to pass," as to lands within the area of 150 feet, if the proposed use is permissible in the adjoining district (subsection b); to grant a variance in the like area "upon appeal in specific cases" where, "owing to special conditions," a literal enforcement of the ordinance would result in "unneces-

sary hardship" (subsection c), and in such circumstances to "recommend" a variance to the governing body where the projected use is not permissible in the adjoining district or the lands are beyond the area of 150 feet (subsection c). *Section* 40:55–39.

Granting that the design of *section* 40:55–39b was to empower the local zoning boards to make such marginal accommodations and adjustments between the opposing restrictions of adjoining districts, consistent with the general purpose and intent of the ordinance, as would serve the community welfare, as distinguished from relief against unnecessary hardship at the instance of a particular landowner under subsection c, it is not applicable beyond the border area of 150 feet. The legislative purpose thus to limit the jurisdiction of these subordinate agencies is clear and explicit. Section 7(1) of the ordinance is not so circumscribed. The adjustment board is not a legislative body; and the local legislative tribunal, even though itself invested with a full measure of the police power, cannot delegate the lawmaking function to it. It is requisite that the appropriate legislative authority establish a sufficient basic standard—a definite and certain policy and uniform rule of action—for the guidance of the agency organized to administer the law, or it will constitute a delegation of legislative power in violation of *article IV, section* 1, *placitum* 1, *of the State Constitution. Vide State Board of Milk Control* v. *Newark Milk Co.,* 118 *N. J. Eq.* 504. And an arbitrary, uncontrolled discretion would constitute an infringement of the fundamental right of private property. There must be a rule of conduct to secure an impartial execution of the policy, and thus to prevent inequality and oppression. *Yick Wo.* v. *Hopkins,* 118 *U. S.* 356; 6 *S. Ct.* 1064; 30 *L. Ed.* 220. Compare *Barbier* v. *Connolly,* 113 *U S.* 27; 5 *S. Ct.* 357; 28 *L. Ed.* 923.

And we do not find a broader power elsewhere in the statute, except in subsection d, and there it is merely recommendatory. We consider that the generality of *section* 40:55–36 is qualified by the specific grants of power embodied in *section* 40:55–39. Unlike the statutes of other states, the function of the zoning board under our act is purely advisory in the

making of exceptions outside of the marginal area, even in cases of undue and excessive hardship. The authority to grant variances in such cases is reserved to the local governing body by subsection d. See *Bassett on Zoning* 163. And subsection c is operative only where the burden of the general rule upon the individual plot would not, because of its unique situation and the singular circumstances, serve the essential legislative policy, and so would constitute a wholly unnecessary and unwarranted invasion of the basic right of private property. It is designed to correct maladjustments and inequities in the operation of the general regulation that take the category of "unnecessary hardships." These powers are to be assayed in the light of the statutory reservation to the local legislative body of the right (fundamentally legislative and exercisable only by ordinance subject to certain conditions) to amend the "regulations, limitations and restrictions" embodied in the zoning ordinance, and to "change" the district boundaries. *Section* 40:55–35.

The local exercise of the zoning power is not absolute and unlimited; it is conditioned by the statutory considerations to be served by zoning. It is requisite that the regulations be made "with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout" the municipality. The regulations "shall be in accordance with a comprehensive plan and designed" to subserve the enumerated purposes, used distributively and not conjunctively; and the division of the municipality into districts shall be such as is "best suited to carry out the purpose" of the statute. And "all such regulations shall be uniform for each class or kind of buildings or other structures throughout each district, but the regulations in one district may differ from those in other districts."

Equality and uniformity of operation within the particular zone, as respects each class or kind of buildings, are basic in the statute. Invidious distinctions and discriminations are inadmissible. The essence of 'zoning is territorial division according to the character of the lands and structures and

their "peculiar suitability" for particular uses, among others, and uniformity of use within the division. *Sections* 40 :55–31, 40 :55–32.

And even though section 7(1) of the ordinance be given the scope asserted, prosecutor cannot prevail. The conversions in the particular district are not comparable in circumstance to the one proposed here. For example, leave was granted to convert five of the Hun School buildings on Stockton Street into housekeeping apartments, and to devote the school kitchen to the use of occupants of rooms formerly assigned to students of that school—a use not unlike the one to which the buildings were applied when the ordinance was adopted. Another, on Bayard Lane, was limited to the duration of the war with Germany and Japan, by the grace of God now happily brought to a close, while the clubhouse is a nonconforming use which antedated the adoption of the ordinance. Each exception depends upon its own circumstances; and rarely do we find two cases alike.

Prior exceptions granted by the adjustment board are not in themselves controlling. Ill-advised or illegal variances do not furnish grounds for a repetition of the wrong. If that were not so, one variation would sustain if it did not compel others, and thus the general regulation eventually would be nullified. The annulment of zoning is a legislative function that is beyond the domain of the zoning board. *Scaduto* v. *Bloomfield*, 127 *N.J.L.* 1; *Berry* v. *Recorder's Court of West Orange*, 124 *Id.* 385; *affirmed*, 125 *Id.* 273. There is no contention that, as regards prosecutor's lands, the general regulation is, by reason of the previously granted variances or otherwise, arbitrary and unreasonable.

And the local board did not err if it considered the side-yard requirements laid down by the ordinance for two-family dwellings in "Residence 'B'" districts. The nonconforming use provision embodied in *section* 40 :55–48 is not applicable in these circumstances. Certainly, where specific side-yard widths are required for two-family dwellings in "Residence 'B'" districts, the zoning board could, in the exercise of its discretion, deny such use in a "Residence 'A'" district where such side-yards are lacking.

The issue of adequate housing facilities was introduced for the first time by depositions taken after the allowance of the writ of *certiorari;* and the evidence thus adduced cannot be considered in determining the reasonableness of the zoning board's action.

This course reveals a misconception of the functions of the adjustment board. As we have seen, it is not invested with arbitrary power. It has been termed a discretionary administrative or *quasi*-judicial body. In this state, it exercises *quasi*-judicial functions, in their essence discretionary, guided by the principle and policy of the statute and the local ordinance so far as consistent therewith. *Brandon* v. *Montclair,* 124 *N. J. L.* 135; *affirmed,* 125 *Id.* 367; *Dubin* v. *Wich,* 120 *Id.* 469; *Schnell* v. *Township Committee of Ocean,* 120 *Id.* 194; *Phillips Oil Co.* v. *Municipal Council of Clifton,* 120 *Id.* 13; *Cook* v. *Board of Adjustment, Trenton,* 118 *Id.* 372. As its title implies, this agency is devised to apply expert judgment to the adjustment of exceptional cases consistently with the design and spirit of the general regulations. It is under a duty to exercise sound discretion controlled by law and reason. "Legal discretion" signifies the course prescribed by law. It connotes a reasonable and just result, taking account of the law and the particular circumstances of the case. *Brandon* v. *Montclair, supra.* The inquiry is whether the board has conformed to the legislative formula; and where there has been a valid and reasonable exercise of the delegated power, there is no occasion for judicial interference. As said, the legislative authority has confided the determination of the question of variances and special exceptions to the specialized judgment of the zoning board; and this court may intervene only where the general regulation or the action taken by the subordinate agency is arbitrary, capricious or unreasonable. It may not substitute its judgment for that of the zoning board within that body's sphere of action. *R. S.* 2:81–8 has no application here. *Brandon* v. *Montclair, supra.* In that case, the Court of Errors and Appeals declared that the judgment of the adjustment board is "final in the absence of fraud or other abuse." As here used, "abuse of discretion" means action that is arbitrary or

unreasonable—such as is in opposition to the intent and policy of the statute and of the ordinance adopted conformably to its provisions, as applied to the facts and circumstances of the case. Exceptions must be consistent with the intent and purpose of the statute and the ordinance. The authority to vary the application of the general regulation is to be sparingly exercised. It is only in rare instances and under exceptional circumstances that relaxation of the general restriction is permissible. The power is granted only for the relief of "specific instances, peculiar in their nature." *Brandon* v. *Montclair, supra.*

Moreover, a housing shortage does not clothe the adjustment board with power to annul or modify zoning regulations. As noted, that is the function of the local legislative body. Indeed, the local governing body amended the ordinance on December 22d, 1942, to permit boarding houses in "Residence 'A' and 'B'" districts until the expiration of six months after the termination of the war.

Lastly, it is contended that the challenged action "was illegal because not based on legal evidence."

But prosecutor had the affirmative of the issue; and the law cast the *onus* of proof upon him. Since he adduced no evidence to sustain it, it was incumbent upon the board to resolve the issue against him. *Brandon* v. *Montclair, supra; Dubin* v. *Wich, supra.* Counsel fails to make the distinction between the grant of an exception without evidence to establish the right and its denial for lack of such evidence.

The judgment is accordingly affirmed, and the writ dismissed, with costs.