[Civ. No. 22896. Second Dist., Div. Two. Oct. 3, 1958.]

ROBERT F. MINNEY, Appellant, v. CITY OF AZUSA, Respondent.

*Assigned by Chairman of Judicial Council.

Birnbaum & Hemmerling and Hayden C. Covington for Appellant.

Tscharner & Tscharner for Respondent.

ASHBURN, J.—Reverend Robert F. Minney, acting as Congregation Servant and presiding minister of Azusa Congregation of Jehovah's Witnesses (a religious organization),

appeals from a judgment which upholds the denial of a variance sought by him under the city's comprehensive zoning ordinance for the purpose of constructing within the R-1 or residential zone a church or "Kingdom Hall" for use of said congregation. The basic claim is denial of religious liberty and violation of the First and Fourteenth Amendments to the Constitution of the United States.

The city of Azusa is a municipal corporation organized in 1898 under the General Municipal Act of 1883, and has a population of about 15,100. Its Comprehensive Zoning Ordinance Number 409 was passed in 1949 and defines numerous zones ranging from single family residential (R-1) to general manufacturing (M-2). It was amended before plaintiff's application for a variance was made, first by Ordinance Number 441 on January 7, 1952, and then by Ordinance Number 455 on August 4, 1952. As thus amended the ordinance provided at the time of plaintiff's application (in August, 1954) that the uses permitted in the R-1 or single family residence zone should be " (a) A one-family dwelling of a permanent character, placed in a permanent location and used by but one family; (b) Agriculture and horticulture, flower and vegetable gardening, nurseries and greenhouses used only for purposes of propagation and culture and not including any sale at retail from the premises nor any signs or displays; . . . (d) Libraries, museums, parks, playgrounds, public schools, and community buildings owned and controlled by the municipality or school district. . . ." (Quotations are from § 5.1 of Ordinance Number 455.) Other portions of the section are not material to the present problem. Section 7.1, covering zone R-3 or multiple family residence zones, authorizes " (a) Any use permitted in Zones R-1 and R-2. (b) Any flat building, apartment house, or bungalow court, together with the out-buildings necessary to such use, located on the same lot or parcel of land. (c) Churches and/or parochial schools." (Quotation from Ordinance Number 441.) Section 8.1(b) of Ordinance Number 409 (not later amended) also permits churches in the R-4 or apartment house zone.

Appellant brought this action attacking the ordinance as discriminatory on its face and in its administrative application to his congregation through denial of a variance which would permit erection of a church in the R-1 zone. His second amended complaint, to which a demurrer was sustained without leave to amend, seeks mandamus, injunction,

declaratory relief, certiorari and prohibition. Having been denied any relief he appeals from the judgment.

The pleading presents first the fundamental issue whether a zoning ordinance can lawfully exclude churches from a residential district. This question is settled in the affirmative so far as California law is concerned. *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints* v. *City of Porterville*, 90 Cal.App.2d 656 [203 P.2d 823], arose under the zoning ordinance of the city of Porterville which established an R-1 zone wherein buildings were restricted to single family residences. Churches were included in the R-4 or "unlimited residence" zone. The Mormon church, through its Presiding Bishop, sought mandamus to compel the city authorities to issue a permit for construction of a church upon property owned by plaintiff within the R-1 zone. Demurrer having been sustained without leave to amend, plaintiff appealed from the judgment. "Plaintiff's contention is that the zoning ordinance as applied to plaintiff to prevent its construction of a church for religious worship upon its property is invalid because, as so applied, it bears no substantial relation to the public health, safety, morals and general welfare and thus is beyond the police power of the state to enact, and further, because the application of the ordinance to petitioner results in a restriction of religious worship in the absence of any grave or imminent danger justifying such a restriction." (P. 658.) The court said, at pages 659-660: "A single family residence may be much more desirable when not in an apartment house neighborhood or adjacent to a public building such as a church. The municipal legislative body may require that church buildings be erected to conform to health and safety regulations as provided in its building code and we see no reason to hold that churches may be erected in a single family residential area when a duplex, triplex, or other multiple dwelling can lawfully be excluded therefrom. The provision in the ordinance for a single family residential area affords an opportunity and inducement for the acquisition and occupation of private homes where the owners thereof may live in comparative peace, comfort and quiet. Such a zoning regulation bears a substantial relation to the public health, safety, morals and general welfare because it tends to promote and perpetuate the American home and protect its civic and social values.

"We find no merit in plaintiff's contention that the application of the ordinance to the plaintiff results in an unwar-

ranted restriction of religious worship. . . . The denial of a building permit did not prohibit anyone from religious worship and there is nothing in the record before us to indicate that the church building could not be erected if located in the area zoned for that purpose.

"The petition fails to state a cause of action in that the facts alleged do not show that the ordinance in question is unreasonable and void as applied to plaintiff." At 661: "The burden is upon the plaintiff to allege and prove physical facts from which the court could conclude as a matter of law that the ordinance was unreasonable and invalid. (*Wilkins* v. *City of San Bernardino, supra* [29 Cal.2d 332 (175 P.2d 542)], p. 338.)

"In enacting zoning ordinances, the municipality performs a legislative function and every intendment is in favor of the validity of such ordinances. (*Jardine* v. *City of Pasadena*, 199 Cal. 64, 72-73 [248 P. 225, 48 A.L.R. 509].) It is presumed that the enactment as a whole is justified under the police power and adapted to promote the public health, safety, morals, and general welfare. (*Lockard* v. *City of Los Angeles*, 33 Cal.2d 453, 460 [202 P.2d 38, 7 A.L.R.2d 990].)

"There is reasonable justification for the action of the defendant city in prescribing the buildings which may be erected and constructed in the zone established for single family residences and in such cases the wisdom of the prohibitions and restrictions is a matter for legislative determination. (*Lockard* v. *City of Los Angeles, supra*, p. 461.)" Our Supreme Court denied a hearing. The United States Supreme Court dismissed an appeal from the judgment "for want of a substantial Federal question" (338 U.S. 805) and denied a rehearing (338 U.S. 939). It later explained the philosophy of the ruling as follows: "When the effect of a statute or ordinance upon the exercise of First Amendment freedoms is relatively small and the public interest to be protected is substantial, it is obvious that a rigid test requiring a showing of imminent danger to the security of the Nation is an absurdity. We recently dismissed for want of substantiality an appeal in which a church group contended that its First Amendment rights were violated by a municipal zoning ordinance preventing the building of churches in certain residential areas. *Corporation of Presiding Bishop, C.J.C.L.D.S.* v. *Porterville,* 338 U.S. 805, *ante,* 487, 70 S.Ct. 78 (1949)."

(*American Communications Assn.* v. *Douds*, 339 U.S. 382, 397 [70 S.Ct. 674, 94 L.Ed. 925].)

The Porterville decision was followed in *City of Chico* v. *First Ave. Baptist Church*, 108 Cal.App.2d 297, 301 [238 P.2d 587], a case involving the validity of a zoning ordinance requiring the obtaining of a use permit before devoting to church uses property located in the residential zone. The Supreme Court recently recognized Porterville as good law, saying in *Roman Cath. etc. Corp.* v. *City of Piedmont*, 45 Cal. 2d 325, 334 [289 P.2d 438]: "Respondents place reliance upon the case of *Corporation of Presiding Bishop* v. *City of Porterville*, 90 Cal.App.2d 656 [203 P.2d 823], in which it was held that by ordinance the city could prohibit all churches in a residential area. That case is distinguishable from the one under consideration. Here, only private schools are excluded—not *all* schools as were all churches in the Porterville case."

Although it did not follow the Porterville doctrine, the Supreme Court of Washington in *State* v. *City of Wenatchee*, 50 Wn.2d 378 [312 P.2d 195, 197], made pertinent observations concerning the weight of authority and the California ruling: "Generally, zoning ordinances which wholly exclude churches in residential districts have been held to be unconstitutional. . . . However, in *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints* v. *City of Porterville*, 90 Cal.App.2d 656 [203 P.2d 823], the California court expressed a view contrary to the prevailing weight of authority. The essence of the reasoning of the California Court seems to be that zoning legislation which prospectively treats all religious groups alike, i.e., prohibits prospectively all churches in certain zones, if otherwise reasonable, may be a valid and a proper non-discriminatory, non-arbitrary exercise of state police power. This viewpoint rejects the reasoning of the weight of authority that churches may be excluded or zoned out of particular areas only on the basis of traffic or other hazards substantially related to public health or safety. The viewpoint of the weight of authority may be an extreme one. It ignores the basic premise of modern day zoning legislation which emphasizes the best and most reasonable land utilization possible, considering the best interests of the entire community. It permits any church group, absent the factor of traffic hazards, substantially related to public health and safety, to acquire land and to establish a church, irrespective of other factors which may be of significant public

interest, and normally considered and emphasized in present day community land use planning programs.''

The Porterville case is but a recognition and application of the concept that there can be no absolutes even in the field of personal freedoms, and that this is and must be a nation of ordered liberties if the fundamental guarantees of the First and Fourteenth Amendments are to survive. Mr. Chief Justice Hughes thus stated the matter in *Cox* v. *State of New Hampshire,* 312 U.S. 569 [61 S.Ct. 762, 85 L.Ed. 1049, 133 A.L.R. 1396] (a case which holds that Jehovah's Witnesses were not entitled to conduct a street parade without first procuring the statutorily required special license) : ''Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend.'' (P. 574.) Also : ''The argument as to freedom of worship is also beside the point. No interference with religious worship or the practice of religion in any proper sense is shown, but only the exercise of local control over the use of streets for parades and processions.'' (P. 578.)

In *Gospel Army* v. *City of Los Angeles,* 27 Cal.2d 232, 242 [163 P.2d 704], the court said: '' 'If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, or force citizens to confess by word of mouth or act their faith therein.' (*West Virginia State Board of Education* v. *Barnette,* 319 U.S. 624, 642 [63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674].) It does not follow, however, that religious organizations enjoy unlimited freedom in carrying on all activities related to their religious program.'' On page 243 it quoted a portion of the above passage from *Cox* v. *State of New Hampshire, supra.* The case upheld a city ordinance requiring plaintiff to procure a secondhand dealer's license to conduct its salvage activities through sale in a secondhand goods store operated by it; this notwithstanding that plaintiff was found to be '' 'engaged exclusively in the promulgation, by literature and word of mouth, of its religious beliefs, by

and through its auxiliaries, and in the procuring of donations in the form of money and articles of value in the prosecution and furtherance of its religious activities.' '' (P. 233.)

In *Cantwell* v. *State of Connecticut*, 310 U.S. 296 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352] (upholding the right of Jehovah's Witnesses to solicit from door to door without first procuring a license as required by statute), the court said: ''No one would contest the proposition that a state may not, by statute, wholly deny the right to preach or to disseminate religious views. Plainly such a previous and absolute restraint would violate the terms of the guaranty. It is equally clear that a State may by general and non-discriminatory legislation regulate the times, the places, and the manner of soliciting upon its streets, and of holding meetings thereon; and may in other respects safeguard the peace, good order and comfort of the community, without unconstitutionally invading the liberties protected by the Fourteenth Amendment.'' (P. 304.) Effect was given to this idea of permissible regulation of ''the times, the places, and the manner of soliciting upon its streets'' by the ruling in *Rescue Army* v. *Municipal Court*, 28 Cal.2d 460 [171 P.2d 8]. The Los Angeles Charities and Relief Ordinance in section 44.09(a) required persons soliciting contributions for charity by means of receptacles in certain specified public places to secure express written permission from the Board of Social Service Commissioners (P. 469). Upholding this requirement the court said, at page 470: ''There can be no question, therefore, that a person is free to hold whatever belief his conscience dictates, but when he translates his belief into action he may be required to conform to reasonable regulations which are applicable to all persons and are designed to accomplish a permissible objective. (*Gospel Army* v. *City of Los Angeles, supra.*)'' Explaining that reliance upon *Cantwell* v. *State of Connecticut, supra*, was misplaced, it further remarked: ''It is clear, however, from what has been said before that the right to the permit required in subdivision (a) of section 44.09 does not depend upon a religious test. . . . As before stated, the authority of the board is limited to regulating the issuance of permits for the solicitation of funds in the designated publicly owned or controlled places *by means of receptacles* for the sole purpose of preventing fraudulent practices and protecting the safety and convenience of the public. 'The general regulation, in the public interest, of solicitation, which does not involve any religious test and does not unreasonably obstruct or delay

the collection of funds, is not open to any constitutional objection, even though the collection be for a religious purpose. Such regulation would not constitute a prohibited previous restraint on the free exercise of religion or interpose an inadmissible obstacle to its exercise.' (310 U.S. 304, 305.)[1] . . . We conclude, therefore, that the provisions of the ordinance underlying the charges against Murdock are constitutional, and that in the absence of admitted or proven facts showing that the ordinance is being unconstitutionally applied, the alternative writ must be discharged and the peremptory writ must be denied.'' (Pp. 472, 473.)

*Murdock* v. *State of Pennsylvania,* 319 U.S. 105 [63 S.Ct. 870, 891, 87 L.Ed. 1292, 146 A.L.R. 81], referring to *Cox* v. *State of New Hampshire, supra,* and *Chaplinsky* v. *State of New Hampshire,* 315 U.S. 568 [62 S.Ct. 766, 86 L.Ed. 1031], says: ''But that merely illustrates that the rights with which we are dealing are not absolutes.'' (P. 110.) Also: ''Jehovah's Witnesses are not 'above the law.' But the present ordinance is not directed to the problems with which the police power of the state is free to deal.'' (P. 116.)

''Although the central issue in determining the validity of an ordinance excluding churches from a zoned area would seem to be whether the restriction interferes with the first-amendment guarantee of freedom of religion as incorporated in the fourteenth, none of the decisions invalidating these ordinances has explicitly rested on this ground. Although the Supreme Court has been strict in its prohibition of prior restraints on freedom of religion or speech, it has held that reasonable regulations of time and place are valid. Whether a zoning ordinance restricting the location of churches is such a reasonable regulation should turn on whether the interference with the free exercise of religion is outweighed by the public interest in restriction. A highly relevant consideration would be the availability to the church of alternative locations.'' (70 Harv. L. Rev. 1436.)

Appellant's briefs finally come to rest upon the proposition that churches are subject to zoning regulations so long as same are not discriminatory on their face or in their administration. ''Appellant admits that churches must comply with the law. This is not gainsaid. But because churches must comply with regulatory, procedural provisions of the zoning law, this does not give unlimited discretion to the adminis-

[1]The Cantwell case.

trators so that they can violate the constitutional rights of churches.'' ''It is said on page 2 of the [respondent's] brief that appellant has a 'theory' that zoning laws, as applied to churches, are unconstitutional *per se*. This is not the contention of the appellant. It is the contention of the appellant that this particular zoning law, on its face and especially as enforced, is unconstitutional. . . . The statement in the middle of page 23 that churches are subject to reasonable zoning regulations is admitted.''

Our discussion must proceed from this point upon the assumption that an ordinance which excludes churches from residence zones and in consequence classifies them in relation to other activities is valid unless it discriminates against churches upon its face or is so administered as to accomplish that result.

Appellant argues that the Azusa ordinance is discriminatory upon its face because churches are excluded from zone R-1 which is open not only to single family residences but also to agriculture, horticulture, flower and vegetable gardens, nurseries and greenhouses used only for purposes of propagation and not for sale at retail; also, libraries, museums, parks, playgrounds, public schools and community buildings owned and controlled by the municipality or school district (Ordinance No. 455, § 5.1). Churches are included in zone R-3 which also embraces flat buildings, apartment houses, bungalow courts and parochial schools (Ordinance No. 441, § 7.1).

It being established law that churches can be excluded legally from a residential zone and that they are subject to reasonable zoning regulations, appellant stands, with respect to this claim of unreasonable classification or discrimination on the face of the ordinance, in the same position as any other litigant who raises that issue. ■ In other words, proposed use of property for religious purposes does not give it *per se* a title to any particular zone; a church, like any other property owner, is to be considered on its merits as fitting into the general scheme of a comprehensive zoning, entitled to no preference and subject to no adverse discrimination.

■ The burden rests upon him who asserts invalidity of the zoning ordinance to show ''such an abuse of discretion on the part of the zoning authorities as would justify the court in concluding as a matter of law that the ordinance is unduly oppressive and not reasonably necessary to promote the general welfare of the people of the community.'' (*Lock-*

*ard* v. *City of Los Angeles,* 33 Cal.2d 453, 467 [202 P.2d 38, 7 A.L.R.2d 990].) See also *Wilkins* v. *City of San Bernardino,* 29 Cal.2d 332, 338 [175 P.2d 542]; *Beverly Oil Co.* v. *City of Los Angeles,* 40 Cal.2d 552, 559 [254 P.2d 865]; *Acker* v. *Baldwin,* 18 Cal.2d 341, 344-345 [115 P.2d 455]; *Otis* v. *City of Los Angeles,* 52 Cal.App.2d 605, 614-615 [126 P.2d 954]. ▇ Every intendment favors a valid exercise of the police power in this respect. (*Idem.*) ▇ Any "zoning plan must be viewed as a whole and the court will not search out individual cases of discrimination or hardship." (*Acker* v. *Baldwin, supra,* 18 Cal.2d 341, 345.) ▇ Effect of a particular zoning upon surrounding properties is to be considered by the zoning authorities (*Lockard* v. *City of Los Angeles, supra,* p. 464; *Robinson* v. *City of Los Angeles,* 146 Cal.App.2d 810, 816 [304 P.2d 814]), as are existing conditions and probabilities of future developments in the area under consideration. (*Acker* v. *Baldwin, supra,* p. 346; *Lockard* v. *City of Los Angeles, supra,* p. 464.) ▇ All this adds up to an ultimate rule that the wisdom of the ordinance is not a matter for the courts unless there is apparent a manifestly unreasonable classification. (*Lockard* v. *City of Los Angeles, supra,* pp. 461-462; *McCarthy* v. *City of Manhattan Beach,* 41 Cal.2d 879, 886 [264 P.2d 932]; *Schumm* v. *Board of Supervisors,* 140 Cal.App.2d 874, 880 [295 P.2d 934]; *Otis* v. *City of Los Angeles, supra,* pp. 605, 613-614.)

▇ Though we might have included churches in the R-1 zone had we drafted the ordinance, that fact alone would not now justify interference with the results achieved by the public body charged with that duty. ▇ "The wisdom of the prohibitions and restrictions is a matter for legislative determination, and even though a court may not agree with that determination, it will not substitute its judgment for that of the zoning authorities if there is any reasonable justification for their action." (*Lockard* v. *City of Los Angeles, supra,* 33 Cal.2d 453, 461.) ▇ "As stated in *Clemons* v. *City of Los Angeles,* 36 Cal.2d 95 [222 P.2d 439], a zoning ordinance enacted pursuant to a comprehensive plan of community development, 'when reasonable in object and not arbitrary in operation,' will be sustained as a proper exercise of the police power; every intendment is in favor of its validity, and a court will not, 'except in a clear case of oppressive and arbitrary limitation,' interfere with the legislative discretion; it is presumed to be adapted to promotion of the

public health, safety, morals and general welfare; and though the court may differ with the zoning authorities as to the 'necessity or propriety' of the regulation, so long as it remains a 'question upon which reasonable minds might differ,' there will be no judicial interference with the municipality's determination of policy." (*McCarthy* v. *City of Manhattan Beach, supra,* 41 Cal.2d 879, 885.)

That these principles are equally applicable to a claim of discrimination when raised by a religious society is attested by *Corporation of Presiding Bishop* v. *City of Porterville, supra,* 90 Cal.App.2d 656 (see language quoted above); also by *Roman Cath. etc. Corp.* v. *City of Piedmont, supra,* 45 Cal.2d 325, 326. "The courts will, of course, inquire as to whether the scheme of classification and districting is arbitrary or unreasonable, but the decision of the zoning authorities as to matters of opinion and policy will not be set aside or disregarded by the courts unless the regulations have no reasonable relation to the public welfare or unless the physical facts show that there has been an unreasonable, oppressive, or unwarranted interference with property rights in the exercise of the police power." (*Lockard* v. *City of Los Angeles, supra,* p. 461.)

Appellant, in arguing unreasonable classification, contends that a church as such is entitled to come within the R-1 zone if libraries, museums, playgrounds and public schools and other buildings owned and controlled by the city or school district are included. He relies somewhat upon *Roman Cath. etc. Corp.* v. *City of Piedmont, supra,* 45 Cal.2d 325, but the case does not fortify his position. That was a matter of discrimination between school and school,—public and private. It was there said, at page 333: "Each case must be decided on its facts, and before us we have only the question of a private school to be located adjacent to a Catholic church in the area where public schools are found." At page 334, distinguishing the Porterville case, *supra*: "That case is distinguishable from the one under consideration. Here, only private schools are excluded—not *all* schools as were all churches in the Porterville case." All churches are excluded from R-1 by the Azusa ordinance and hence the Piedmont case, *supra,* does not apply here. Likewise, the many decisions which appellant cites to the effect that churches cannot be excluded from residential zones are of no assistance to his cause for the California law is to the contrary.

 It is asserted and asseverated that the ordinance ex-

cludes churches from 90 per cent of the area of the city of Azusa and, as more than half of the other 10 per cent is now devoted to other uses, the result is that less than 5 per cent of the total area of the city is actually available for church purposes, that much of that 5 per cent is located along Santa Fe and Pacific Electric rights of way or adjacent to industrial sites, and therefore ''undesirable'' for church locations because of obnoxious fumes, noise, smoke and the like. This case comes up as the result of sustaining of demurrer to the second amended complaint; attached thereto or incorporated by reference are the zoning ordinances and map, but they do not show the truth of the asserted facts; so it cannot be said that the face of the ordinance shows the alleged discrimination. In this aspect of the matter the allegation of the complaint must yield to the showing of the exhibits which it undertakes to interpret (39 Cal.Jur.2d, § 62, p. 93). The averment if true is immaterial, for we are now dealing with discrimination and unreasonableness upon the face of the ordinance. When we reach the matter of a variance the question of truth of these allegations becomes pertinent and it will then appear that there was no substantial proof of the truth of same.

Without attempting to divine and justify the reasoning underlying the Azusa ordinance (not the business of this court), we find no showing on plaintiff's part that good reason did not exist for the classification found in the subject ordinance. ''The burden rests upon the plaintiff to establish the invalidity of the ordinance in its application to the property involved. The plaintiff's failure to sustain this burden raises a presumption of the existence of such facts as are sufficient to sustain the ordinance. (*Pacific States Box & Basket Co.* v. *White,* 296 U.S. 176 [56 S.Ct. 159, 80 L.Ed. 138, 101 A.L.R. 853].)'' (*Beverly Oil Co.* v. *City of Los Angeles, supra,* 40 Cal.2d 552, 559.) Accord: *Safeway Stores* v. *City Council, San Mateo,* 86 Cal.App.2d 277, 284 [194 P.2d 720]; *Robinson* v. *City of Los Angeles, supra,* 146 Cal. App.2d 810, 818; *De Luca* v. *Board of Supervisors,* 134 Cal. App.2d 606, 610 [286 P.2d 395]. The Pacific States case says, at page 185: ''The order here in question deals with a subject clearly within the scope of the police power. [Citation.] When such legislative action 'is called in question, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts, and one who assails the classification must carry the

28

burden of showing by a resort to common knowledge or other matters which may be judicially noticed, or to other legitimate proof, that the action is arbitrary.' " The contention that the instant ordinance contains arbitrary and unreasonable classification must be rejected.

The same result flows from another line of thought. Appellant has proceeded in such manner as to preclude his attacking the constitutionality of the ordinance "[A] 'variance' presupposes the reasonableness of the zone regulation as a whole." (*Moriarty* v. *Pozner*, 21 N.J. 199 [121 A.2d 527, 533].) The present controversy stems from rejection of an application for a variance. Plaintiff did not initially attempt to compel issuance of a permit to him upon the theory that the ordinance is *per se* arbitrary and discriminatory. On the contrary, he applied in the first instance for a variance permitting a church in zone R-1. By so doing he precluded himself from arguing that the zoning board (city planning commission) has no power (because of invalidity of the ordinance) to grant the concession, the variance which he seeks.

 It is so held in *Rubin* v. *Board of Directors,* 16 Cal. 2d 119 [104 P.2d 1041]. The court there said, at pages 124-125: "Unlike the 'spot zoning' obtained by amendment of the general zoning ordinance, a variance or exception sanctions a deviation from the standard under the dispensing power vested in the administrative body. . . . On the other hand, the grant of dispensation is a matter of grace, and a refusal is not the denial of a conditional statutory right; it merely leaves in operation the statute adopted by the legislative body. (*People* ex rel. *Fordham M. R. Church* v. *Walsh, supra* [244 N.Y. 280 (155 N.E. 575)].)

 "The application for a variance necessarily admits the constitutionality of the ordinance under which the city officials charged with the duty of administering a zoning ordinance are asked to exercise a discretion; therefore, an applicant may not challenge its constitutionality before the administrative body. For if an attack on constitutional grounds was successful, the discretionary power of the board would also fall. In a proceeding to review a decision denying a variance, it has been held that 'the sole question before the court is the propriety of the action of the board upon the application addressed to its discretion, and the petitioner will not be heard upon the question of the constitutionality of the act of the Legislature under which the ordinance was

enacted.' '' Also, at page 126: "But the finality of the board of directors' determination does not bar the respondents from asserting in a judicial proceeding that the zoning law is unconstitutional as applied to their property. . . . When the board of directors of Pasadena denied petitioners' application for a variance it did not take away a property right, but merely refused to grant a favor. Its action left the petitioners' property subject to the zoning restrictions then in force." This decision was applied in *Metcalf* v. *County of Los Angeles,* 24 Cal.2d 267, 272 [148 P.2d 645], and *Hadden, Inc.* v. *City of Inglewood,* 101 Cal.App.2d 47, 48 [224 P.2d 913]. Upon oral argument counsel for appellant conceded that this line of cases leaves open to him only the claim that the denial of a variance amounted to discriminatory application of the ordinance to appellant's property.

The matter of variances is covered by article XIX of Ordinance Number 409. Section 19.1 authorizes them in the following language: "When practical difficulties, uncessary [sic] hardships, or results inconsistent with the general purposes of this Ordinance occur through a strict interpretation of its provisions, the Commission, upon its own motion may or upon the verified application of any property owner or owners, shall in specific cases initiate proceedings for the granting of a variance from the provisions of this Ordinance under such conditions as may be necessary to insure that the spirit and purpose of this Ordinance will be observed, public safety and welfare secured, and substantial justice done. . . ." Section 19.2: "Before any variance may be granted, it shall be affirmatively shown: (a) That there are special circumstances attached to the property referred to in the application or motion, which do not apply generally to other properties in the same District; (b) That the granting of such variance is necessary to do substantial justice, and to avoid practical difficulty, unnecessary hardship, or results inconsistent with the general purpose of this Ordinance; (c) That the granting of the variance will not result in material damage or prejudice to other property in the vicinity, nor be detrimental to the public health, safety, or general welfare." The application must be referred immediately to the Planning Commission for hearing (§ 19.3). Section 19.4 provides that the application shall be accompanied by: "(d) Evidence of the ability and intention of the applicant to proceed with actual construction work in accordance with said plans within ninety

(90) days from the date of granting said application." Section 19.5: "The Commission shall cause such investigations of fact bearing on the application to be made as will provide necessary information to insure that the action on each such application is consistent with the intent and purpose of this Ordinance." A public hearing is required and a "verbatim transcript of all testimony offered at a public hearing, together with the names and addresses of all persons testifying shall be recorded and made a part of the permanent files of the case." (§ 19.6.) The commission is required to render "a report and recommendation to the City Council" (§ 19.7) which shall review the same and may confirm, reverse or modify the action of the commission without a hearing after having read the complete verbatim transcript of the commission hearing. The council may also "[s]et the matter for public hearing before itself, make its own findings and grant or deny the application accordingly." (§ 19.8, subd. (3).) "The action of the City Council upon an application for a variance is final and conclusive as to all things involved in the application." (§ 19.8.)

In the present instance there were two hearings, one upon an original application for a variance and the other upon a "verified supplement to petition for variance," which latter document was filed after the commission and the council had denied the original application. The complaint incorporates the complete transcript of each hearing before the commission, also the minutes of the city council.

A proceeding for a variance is initiated upon motion of the commission or "upon the verified application of any property owner or owners" (§ 19.1). Respondent questions appellant's status as an applicant. The record shows that appellant (who is acting as trustee for the congregation and pursuant to its authority) never acquired title to the property covered by his application. He entered into an arrangement with the owner by which he agreed to purchase the lot provided he was able to secure a variance for construction of a church thereon. He testified before the commission: *"Mr. Minney*: We bought it with the understanding that if a church could be erected, the lot would be ours. *Mr. Teasley*: Then actually you will not lose any money? *Mr. Minney*: No, we will lose nothing except time and a good location for a church."* The reply brief says that "appellant would not lose the deposit of money made on the option to purchase" if the variance is not effectuated. The supplement to petition alleges that "the

property is now held in escrow.'' Oral argument indicated that plaintiff held an option to purchase at the time of the first hearing, that the matter had progressed to an escrow at the time of the second, but that plaintiff has never been in danger of losing anything if the deal is frustrated by denial of a variance. ■ The purchase having been made upon condition of a variance being issued, and plaintiff having paid nothing irrevocably, it can hardly be said that he is the owner within the purview of the ordinance which makes ownership the criterion of a right to file a petition. (*Cf.* 1 Yokley on Zoning Law and Practice (2d ed.), 1957 Supp., p. 92, § 134; *Lee* v. *Board of Adjustment,* 226 N.C. 107 [37 S.E.2d 128, 131, 168 A.L.R. 1].) This question of Rev. Minney's right to file the application for variance is so closely related to that of hardship that it need be pursued no further.

■ Section 19.1 predicates the granting of a variance upon ''practical difficulties, unnecessary hardships, or results inconsistent with the general purposes of this Ordinance.'' Section 19.2(b) requires an affirmative showing *inter alia* that a variance is required to avoid unnecessary hardship. It appears that plaintiff did not canvass the area for other church sites but took an option on this one with full knowledge of the zoning and upon condition that he could obtain a variance. Self-induced hardship is not within the purview of the ordinance. Only that type of hardship which inheres in the particular property is recognized,—such as inability to use it for purposes of its existing zoning caused by the prevailing uses of surrounding property. Examples of cognizable hardship are given in *Wilkins* v. *City of San Bernardino, supra,* 29 Cal.2d 332, 340 [175 P.2d 542]. ■ ''A 'variance' for undue hardship is grounded in conditions peculiar to the particular lot as distinguished from other property in the use district.'' (*Beirn* v. *Morris,* 14 N.J. 529 [103 A.2d 361, 364].) See also *Preye* v. *Board of Adjustment,* 22 N.J. S. 161 [91 A.2d 597, 602]; *In re Michener's Appeal,* 382 Pa. 401 [115 A.2d 367, 371]. Subdivision (a) of section 19.2 of the Azusa ordinance so provides: ''That there are special circumstances attached to the property referred to in the application or motion, which do not apply generally to other properties in the same District.''

■ One who purchases property in anticipation of procuring a variance to enable him to use it for a purpose for-

bidden at the time of sale cannot complain of hardship ensuing from a denial of the desired variance. (*Gleason* v. *Keswick Improvement Assn.*, 197 Md. 46 [78 A.2d 164, 165-166]; *Preye* v. *Board of Adjustment, supra*, [91 A.2d 597], p. 604; *Union Free School Dist.* v. *Village of Hewlett Bay Park*, 198 Misc. 932 [102 N.Y.S.2d 81, 83], affirmed 103 N.Y.S.2d 831; *Selligman* v. *Von Allmen Bros.*, 297 Ky. 121 [179 S.W.2d 207, 210]; *Beirn* v. *Morris, supra* [103 A.2d 361], p. 364; *Clark* v. *Board of Zoning Appeals of Hempstead*, 301 N.Y. 86 [92 N.E.2d 903]; 1 Rathkopf, The Law of Zoning and Planning, § 3, p. 748.)

The burden of appellant's main attack upon the city's denial of a variance is that of alleged discrimination growing out of the fact that other churches have been granted variances permitting them to build in the R-1 zone. The specifications are Concordia Lutheran Church on September 28, 1949; First Christian Church, August 31, 1950; Church of Christ, May 10, 1951; Church of the Nazarene, August 29, 1951; Emanuel Baptist Church, January 7, 1954. The Emanuel parcel lies immediately south of plaintiff's lot; the variance was in effect at the time of the first hearing and denial but had lapsed before hearing was had upon appellant's supplemental application. It also appeared at the hearing that the Catholic, Presbyterian and Friends churches are located outside the R-1 zone, but when they were erected is not shown. That the commission and the council have not discriminated against churches as such is witnessed by the five variances just mentioned.

Appellant centers upon the Emanuel Baptist Church variance for a lot in the same block with plaintiff's and insists that that of itself proves unwarranted discrimination as matter of law. The authorities are to the contrary. ■ "Prior exceptions granted by the adjustment board are not in themselves controlling. Ill-advised or illegal variances do not furnish grounds for a repetition of the wrong. If that were not so, one variance would sustain if it did not compel others, and thus the general regulation eventually would be nullified. The annulment of zoning is a legislative function that is beyond the domain of the zoning board." (*Potts* v. *Board of Adjustment*, 133 N.J.L. 230 [43 A.2d 850, 854].) "The nonconforming uses do not justify the variance sought. If the rule were otherwise, one variation would sustain if it did not compel others, and thus the general regulation would in time be rendered abortive. [Citations.] A variant use of plaintiff's

lands would necessarily be the basis for others and thus the disintegrating process would be set in motion." (*Beirn* v. *Morris, supra,* 14 N.J. 529 [103 A.2d 361, 364].) To the same effect are, *Moriarity* v. *Pozner, supra,* 21 N.J. 199 [121 A.2d 527, 534] ; *Scaduto* v. *Town of Bloomfield,* 127 N.J.L. 1 [20 A.2d 649, 651] ; *Ventresca* v. *Exley,* 358 Pa. 98 [56 A.2d 210, 212] ; *Chudnov* v. *Board of Appeals of Town of Bloomfield,* 113 Conn. 49 [154 A. 161, 164] ; *Young* v. *City of Abilene* (Tex.), 195 S.W.2d 838, 840 ; *Van Meter* v. *Westgate Oil Co.,* 168 Okla. 200 [32 P.2d 719, 721-722] ; *Brous* v. *Town of Hempstead,* 272 App.Div. 31 [69 N.Y.S.2d 258, 261] ; *O'Connor* v. *Mayor and Council of Borough,* 1 N.J.Super. 638 [65 A.2d 127, 129] ; *Hay* v. *Board of Adjustment of Borough of Fort Lee,* 37 N.J. Super. 461 [117 A.2d 650, 653] ; 58 Am.Jur. § 205, p. 1052 ; 168 A.L.R. 42 Anno. This is also the California law. ██ "It was not a denial of plaintiffs' constitutional right to the equal protection of the laws for the city of Los Angeles to discriminate against plaintiffs by granting variances to some property owners and refusing a variance grant to plaintiffs in the same district." (*Otis* v. *City of Los Angeles, supra,* 52 Cal.App.2d 605, 613 [126 P.2d 954].) "If an owner could compel the extension of the boundaries of the 'island,' by any such showing, then the next adjoining owner in turn could likewise make the same kind of a showing and obtain another extension of the 'island' to his property, and in a short time there would be an end to the effectiveness of all zoning legislation." (*Wilkins* v. *City of San Bernardino, supra,* 29 Cal.2d 332, 341 [175 P.2d 542].) "The fact that variances may have been granted to some owners and denied to others, however, does not establish unreasonable discrimination. The granting or denial of variances rests largely in the discretion of the body designated by the zoning ordinance for that purpose, and a denial of a variance will not be disturbed in the absence of a clear showing of abuse of discretion." (*County of San Diego* v. *McClurken,* 37 Cal.2d 683, 691 [234 P.2d 972].)

██ Appellant insistently claims that there was prejudice against Jehovah's Witnesses which controlled the decision of the zoning authorities. The only evidence to which counsel can point is the statement of one objector at the first hearing who testified: "Stemrich: I am not prejudiced, but if people know that there is a Witness church in the neighborhood they would just as soon move out. Hawkins: Would any other

church do it? Stemrich: As far as I am concerned all religions are the same but there are some people that have different outlooks.'' There is nothing in the record to raise an inference that the committee or the city council adopted Stemrich's view. The inference from the hearing record seems plain that petitioner and his associates sought to ride through the hearing upon the emotional issue of prejudice against Jehovah's Witnesses, buttressed by the claim of absolute right of a church to have a variance when and where it desires. Rev. Minney's showing at this original hearing was little more than *pro forma*.

It consisted of submission of plans and drawings of the proposed church building, simple in design, finished with stucco outside and plaster inside, to occupy 2,500 square feet, and cost approximately $12,000; assurance was given that the portion of the lot not occupied by the building would be blacktopped for offstreet parking. Days and hours of customary services were stated, the congregation was said to have as members 70 residents of Azusa, and the meetings were declared to be orderly and not noisy. No evidence was adduced by applicant on the subjects of special circumstances surrounding the particular property, necessity of avoiding practical difficulties, unnecessary hardship or results inconsistent with the purpose of the ordinance; no evidence was presented concerning damage or prejudice to other property in the zone and no attention given orally to the general welfare. All of this seems to have been proffered or omitted upon the assumption of a legal right to a variance for a church. Petitions opposing the variance, signed by 47 residents of the immediate neighborhood, were presented and various persons spoke in opposition to the application, each assigning his own reasons as would be expected. They concern mainly a desire for a quiet neighborhood and objection to increased traffic. The commission was required to make a factual investigation before the hearing and presumptively did so. As the decision had to be reached in the light of the comprehensive zoning plan and of existing and future conditions, the members of the commission necessarily had to supplement the testimonial showing by resort to their own knowledge. (See 1 Yokley, Zoning Law and Practice (2nd ed.), § 127, p. 308.) The application was denied because of ''approximately 47 names being presented in protest and representation in the audience protesting another church in this area.'' While objections of property owners cannot control the decision they are

not to be disregarded. (*City of Stockton* v. *Frisbie & Latta,* 93 Cal.App. 277, 281, 295 [270 P. 270].) On September 7, 1954, the council denied the application: "Due to the number of protests filed with the Council by people in the immediate vicinity."

In January, 1955, appellant filed his "Verified Supplement to Petition for Variance" claiming prejudice against Jehovah's Witnesses and breathing defiance to the zoning authorities. It does pay formal obeisance to constituted authority, saying in paragraph XV: "I am making this application for a variance so as to render 'unto Caesar that which belongs to Caesar,' for the purpose of orderliness and complying with the regulations and ordinances of the City of Azusa." It seems unfortunate that that other precept of the Master was not kept in mind: "And whosoever shall compel thee to go a mile,[2] go with him twain." (Matthew 5:41.)

Immediately following the sentence above quoted, paragraph XV continues: "I contend, however, under the Constitution of the United States and the Constitution of the State of California, that the ordinances of the City of Azusa above quoted, which require a variance for a church to be built in any neighborhood, except in an R-3 zone . . . are void because no city or political subdivision or state authorities thereof have the right to require a variance before a piece of property can be used for a church." Paragraph XIX: "I anticipate that the Planning Commission of the City of Azusa and the City Council will deny this application, as the Planning Commission and the City Council previously denied my application." Paragraph XXX: "Said sections of the code have been enforced by the Planning Commission and the City Council so as to authorize many of the orthodox and popular religions to build church buildings or repair or add additions thereto in the City of Azusa since the passage of said measures, while discriminating against the Jehovah's Witnesses."

This petition was followed by a hearing before the Planning Commission on February 2, 1955, at which additional evidence was taken. It was devoted largely to the traffic question. A new objectors' petition was presented containing some 109 names, and "setting forth various reasons such as depreciation of property values, noise and traffic, improper zoning in that it was all R-1 originally." Concerning this latter point

[2]Referring to impressment by Caesar's soldiers (see Barklay on The Gospel of Luke, p. 295).

Mr. Stemrich testified: "The only thing that I have against buildings going in that area is that if one is granted then there will be more granted. There is quite a bit of vacant property there and if the variance is granted, more buildings and apartments will be built." ▓▓▓ Photographs attached to the complaint show this neighborhood to be largely undeveloped. But a "growing residential area is as reasonable an object of protection as one which is fully built up." (*Jones* v. *City of Los Angeles*, 211 Cal. 304, 309 [295 P. 14].)

Plaintiff said that a church would not "devaluate" his own residence property within the zone nor would it add to its value. Asked if there were any special circumstances applicable to this property, he said: "Yes, the property next door and then, of course, the church across the street are R-3 and R-4. The land is not generally developed. The street is black topped half the distance." The "property next door" seems to refer to the Baptist parcel, and "the church across the street" is nonexistent.

The supplemental application says: "I desire to state, also, that we will plant suitable plants, trees and shrubs, and our congregation is fully prepared to carry the financial burden, and are able to do so, necessary to complete construction." Section 19.4, subdivision (d), requires proof of ability and intention to proceed with actual construction work within 90 days from granting of application. No affirmative evidence to this effect was offered by applicant. When interrogated by the chairman of the board he testified: "Teasley: According to the ordinance you have to start work within 90 days after the ordinance is granted, and you have a right to request an extension of time—can you start your work within 90 days? Minney: We can start before 90 days. Teasley: Can you show us proof that you can? Minney: We are prepared to go ahead with this matter. We can't show you any financial statement but we have the money available. Shier [attorney for petitioner]: There is a party that is going to loan the money to the congregation—it will be paid for completely." The showing went no further. ▓▓▓ In the first hearing plaintiff testified the building would cost $12,000; in the second he said the cost would be $15,000. The price of the lot (as yet unpaid) was not given. The name of the prospective lender was not disclosed; his ability to perform was not shown; whether he had legally bound himself to make the loan does not appear. Certainly the commission was justified in reject-

ing this as proof of one of the matters which must be shown affirmatively upon such an application.

As a result of this hearing the commission found that the Baptist permit was no longer outstanding, many protests from residents residing within 300 feet from the property had been received, many residents in the locality had purchased homes because they were situated in an R-1 zone, these homes were built some years before appellant's application for variance was made, the erection of a church in the locality "would be detrimental to and reduce valuation of properties in said vicinity"; also that a variance "would be inconsistent with the general purposes of the ordinance"; that applicant had failed to show that he had the ability to proceed with actual construction within 90 days. It was therefore recommended that the variance be denied. The matter came before the council on February 21st and it denied the application "upon all the ground[s] as set forth in the resolution of the Planning Commission."

At none of the hearings before the commission or council was any proof made in support of the claim that the ordinance excludes churches from 90 per cent of the area of the city, that less than 5 per cent thereof is actually available for church purposes and that much of that 5 per cent is located along railroad rights of way and other industries. This matter was inherent in the issues of practical hardship etc. which the planning commission was required by ordinance to consider at the hearing before it. The ordinance and zoning map do not support the allegation,—not without the aid of oral explanation and application to the city's entire area. Of course, the application for variance is not evidence of the truth of its own averments. The complaint makes these allegations, but averments of the pleading cannot fill any hiatus in the proof before the commission and city council for the courts have no jurisdiction to grant a hearing de novo. (*Wheeler* v. *Gregg*, 90 Cal.App.2d 348, 361 [203 P.2d 37]; *Steiger* v. *Board of Supervisors*, 143 Cal.App.2d 352, 356 [300 P.2d 210].)

 A clear showing of abuse of discretion is essential to a successful attack upon the granting or denial of a variance (*Wilkins* v. *City of San Bernardino, supra,* 29 Cal.2d 332, 338, 343; *County of San Diego* v. *McClurken, supra,* 37 Cal.2d 683, 691; *Beverly Oil Co.* v. *City of Los Angeles, supra,* 40 Cal.2d 552, 559; *Otis* v. *City of Los Angeles, supra,* 52 Cal.

App.2d 605, 614, 615; *Steiger* v. *Board of Supervisors, supra,* 143 Cal.App.2d 352, 357), for every intendment favors a valid exercise of the police power by the zoning authorities (*Wilkins* v. *City of San Bernardino, supra,* 338-339; *Lockard* v. *City of Los Angeles, supra,* 33 Cal.2d 453, 461, 467; *Acker* v. *Baldwin, supra,* 18 Cal.2d 341, 344; *Otis* v. *City of Los Angeles, supra,* 613), and there is a presumption that the necessary facts have been ascertained and found by the zoning commission. (*Bartholomae Oil Corp.* v. *Seager,* 35 Cal.App.2d 77, 80 [94 P.2d 614]; *Wheeler* v. *Gregg, supra,* 90 Cal.App. 2d 348, 360; *Steiger* v. *Board of Supervisors, supra,* 356; *North Side etc. Assn.* v. *County of Los Angeles,* 70 Cal.App.2d 598, 608 [161 P.2d 613]; *Schumm* v. *Board of Supervisors, supra,* 140 Cal.App.2d 874, 880 [295 P.2d 934]; *Lindell Co.* v. *Board of Permit Appeals,* 23 Cal.2d 303, 323 [144 P.2d 4].)

▇ Moreover, it is manifest that failure to prove any of the matters required by the ordinance must result in a denial of a variance application. Appellant failed to make the necessary proof under the ordinance and there has been no showing of abuse of discretion on the part of the commission or the city council.

Appellant's attorneys argue, however, that the discretion here exercised was an arbitrary one because the ordinance did not prescribe sufficiently definite standards for the exercise of discretion by the commission. ▇ It is apparent from the ordinance that the commission does not decide but merely recommends appropriate action to the city council. It is settled that such power to hear and recommend may be delegated validly to the commission. (*Johnston* v. *Board of Supervisors,* 31 Cal.2d 66, 73 [187 P.2d 686]; *Hopkins* v. *MacCulloch,* 35 Cal.App.2d 442, 450 [95 P.2d 950]; *Meyers* v. *Board of Supervisors,* 110 Cal.App.2d 623, 630 [243 P.2d 38]; *Wheeler* v. *Gregg, supra,* 90 Cal.App.2d 348, 363; *Steiger* v. *Board of Supervisors, supra,* 143 Cal.App.2d 352, 355-356.)

▇ Of course, reasonably definite standards must be prescribed as a basis for board action, but the degree of definitiveness must be tested according to the inherent uncertainties in the subject matter. ''A zoning ordinance places limitations upon the use of land within designated areas in accordance with the general policy adopted by the legislative body. The ordinance may be arbitrary and discriminatory in isolated cases as applied to certain property, and compliance therewith may present unusual difficulties in many other instances. But it is manifestly impracticable, if not impossible, to enumer-

ate in the ordinance itself the varied factual situations to which the ordinance is not applicable because of constitutional objections or other special considerations. Consequently, almost every zoning ordinance, including the one under consideration, contains provisions whereby an owner may apply to an administrative body for permission to put his land to a non-conforming use." (*Metcalf* v. *County of Los Angeles, supra,* 24 Cal.2d 267, 270 [148 P.2d 645].) ▉ "The statutory rule of 'unnecessary hardship' as a guide for variances, has been generally upheld as adequate." (20 Law and Contemporary Problems, p. 291.) See also 1 Yokley, Zoning Law and Practice (2d ed.) § 135, p. 327. Standards no more specific than those at bar have been held adequate in *Hilton* v. *Board of Appeals of City of Geneva,* 18 N.Y.S.2d 213, 217; *Maxwell* v. *Klaess,* 192 Misc. 939 [82 N.Y.S.2d 588, 590, 592]; *Bishop* v. *Board of Zoning Appeals,* 133 Conn. 614 [53 A.2d 659, 662]; *Potts* v. *Board of Adjustment, supra,* 133 N.J.L. 230 [43 A.2d 850, 853-854]. See also standards prescribed by the Legislature of this state in section 65853, Government Code. This record does not warrant the conclusion that arbitrary power was conferred upon the commission or that the power delegated to it was arbitrarily exercised.

▉ Do all of the foregoing principles fall into the discard when a religious organization asserts a right to a variance? This question has been answered in the negative in *West Hartford Meth. Ch.* v. *Zoning Board of Appeals,* 143 Conn. 263 [121 A.2d 640, 643]; *Galfas* v. *Ailor,* 81 Ga.App. 13 [57 S.E.2d 834, 836]; *Miami Beach United Lutheran Church of the Epiphany* v. *City of Miami Beach* (Fla.), 82 So.2d 880. In the last cited case it is said, at page 882: "It seems that the appellant bought the property with knowledge of the zoning restrictions when, as we understand the record, sites for churches were available in other parts of the city. The restrictions were imposed by an ordinance that was presumptively valid, so the appellant in this suit assumed the 'extraordinary' burden of alleging and proving that the ordinance was invalid. . . . ▉ It is commonly known that generally the activities of the present-day churches are wide and varied as, indeed, they should be. The use of church buildings and facilities is not confined to worship periods on Sunday and mid-weekly prayer meetings. They are often used as places of instruction and entertainment. We do not frown upon these activities; on the contrary we think they should be promoted and encouraged. But we do not agree that because

of the merits of these activities it can be said that an infringement of the constitutional rights of the owner results if it is not allowed use of the property for such purposes in the midst of a section of the city which has been restricted, and which the appellee in this instance knew had been restricted, primarily to homes to be occupied by individual families." With this we agree.

*City of Chico* v. *First Ave. Baptist Church, supra,* 108 Cal. App.2d 297, involved the assertion of church immunity to an ordinance requirement of obtaining a special use permit for a church in a residential zone, and it was held that *"Corporation of Presiding Bishop of the Church of Jesus Christ* v. *City of Porterville,* 90 Cal.App.2d 656 [203 P.2d 823], seems to be a complete answer to appellant's contentions." (P. 301.)

It also appears from the record in the Porterville case, *supra,* that the litigation actually arose out of the city's denial of a variance requested by the church and the court's ruling necessarily recognized application of the presumptions and other principles therein discussed to a variance proceeding.

It is apparent that the complaint could not be successfully amended and hence the demurrer was properly sustained without leave.

Judgment affirmed.

Fox, P. J., and Herndon, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 1, 1958. Carter, J., and Traynor, J., were of the opinion that the petition should be granted.