DANIEL J. MORIARTY, *ET AL.*, PLAINTIFF-APPELLANTS, v. JACK POZNER, SAM POZNER, BOARD OF ADJUSTMENT OF THE TOWNSHIP OF NORTH BERGEN, AND THE BOARD OF COMMISSIONERS OF THE TOWNSHIP OF NORTH BERGEN, DEFENDANTS-RESPONDENTS.

Argued February 13, 1956—Decided March 21, 1956.

*Mr. George Heftler* argued the cause for appellants (*Mr. Jacob Green* and *Mr. S. David Harrison* on the brief; *Messrs. Platoff, Platoff & Heftler,* attorneys).

*Mr. Joseph C. Glavin* argued the cause for the respondents Jack Pozner and Sam Pozner (*Mr. Robert L. Garibaldi* on the brief; *Messrs. Burke, Sheridan & Hourigan,* attorneys).

*Mr. Nicholas S. Schloeder* argued the cause for the respondent Township of Bergen.

The opinion of the court was delivered by

HEHER, J. At issue here is the legal sufficiency of a variance permitting the construction of a "shopping center, containing retail stores, and the balance of the property to be paved and used for off-street parking for the patrons" of the center, on the lands in the Township of North Bergen zoned for residence use, known as Nos. 3101-3149 Hudson Boulevard, recommended to the governing body by the local board of adjustment by a resolution adopted December 28, 1954, and approved by a resolution of the governing body on January 5, 1955, all in the purported exercise of the power granted by *N. J. S. A.* 40:55-39(*d*).

North Bergen is an urban community. The subject property is a tract of 17 acres, to the west of the Hudson County Boulevard. A strip 100 feet deep running 370 feet along the Boulevard, constituting part of the easterly boundary of the property, is zoned for business; the remainder is classified as a "Second Residential Zone or District" closed to "business," "commercial enterprises," "manufacturing," "industrial enterprises," "nuisances *per se*," and "garages of any kind * * * upon any vacant lot." Both sides of the Boulevard are zoned for general business to a depth of 100

feet, and so used. The Boulevard on either side throughout the municipality is generally strip-zoned for business, to a uniform depth of 100 feet. This has been the general local legislative rule. Under the zoning ordinance, adopted in 1934 and amended in 1949 and 1951, the particular lands may be used for dwellings of any type or size and apartment use as well; the tract is suitable in size and otherwise for multi-story apartment units, with sufficient area for land-scaping and parking. The allowance of the variance would extend the business use permissible on the Boulevard frontage to the whole of an area that has been used for commercial recreation purposes since 1898, popularly known as "Columbia Park," a nonconforming use. The commercial and business uses nearby are either confined to a business zone or con-stitute nonconforming uses protected by the statute. The *locus* is bounded on the north by a home for the aged and vacant lands forming a part of a commercial enterprise known as "Scheutzen Park," a carnival, picnic and bowling grounds; the western boundary is an "undeveloped" "paper street" known as Grand Avenue; and the southerly end abuts a street which in all seeming provides access to several high-ways, although respondents suggest that the want of direct approach to the Lincoln Tunnel depressed highway on the south is a factor of major importance. But the problem, if there is one, is certainly not irremediable.

The immediate community has not changed in character or use since the adoption of the zoning ordinance, save for diminution of the nonconforming Columbia Park use itself. The area immediately to the south and west is in the main undeveloped, but is zoned for residences; there is a first-class apartment house development a few blocks to the south, on the westerly side of the Boulevard; and there is a public housing development on the same side of the Boulevard, a short distance to the north, in Union City.

The topography of the *locus* is common to lands in the area on the west side of the Boulevard. Such slope as there is on the particular tract will not interfere with the erection and use of apartment dwellings. The contention *contra* is, in

brief, that the "only means of ingress and egress to the property is through or over the Hudson Boulevard business frontage; that the westerly approaches were cut off from any practical utility no matter what use was made of the property," and "to run an access road over the business frontage to service a possible rear residential development would not be conducive to good planning." Such is the view of the planning expert called in support of the proposed variance. He said also that neither North Bergen nor Union City zoning could be termed "part of a comprehensive plan"; the zoning ordinance adopted in 1934, he continued, "was not based upon a comprehensive plan as defined in the statute." It is urged that the "character of the neighborhood in general is business or commercial"; and the "only similarity between Columbia Park and areas north and south along the Boulevard, insofar as the possibilities of residential development of the Park are concerned, is that all property slopes off in the west or rear, but additionally Columbia Park was not only deprived of access from the west by the topography, but also was cut off from access by a highway on the south and business on the north," and "All other properties in the area had access to other streets running perpendicular to or parallel with the Boulevard."

Upon the first submission of the issue, the Law Division of the Superior Court remanded the cause for "further hearing" and a specification of the "reasons for the granting of the variance." The rehearing was had; and the variance was again recommended by the board of adjustment, on these grounds:

(1) It is "not feasible or practicable to subdivide the area for residential purposes" because of the "shape" of the "premises, being only 370 feet in width" on the Boulevard, "while it is 1022 feet on the rear and irregular in depth ranging for (sic) 628 feet to 872 feet," and the "only means of ingress and egress" are "over or through the Boulevard frontage, which is zoned for business to a depth of 100 feet"; (2) the "immediate neighborhood" as well as the premises in question "are presently devoted to business and commercial

enterprises and are not developed to any extent for residential purposes"; (3) the surroundings and the limited access "create special conditions peculiar to the lot, imposing a burden on the owners if the present restriction is enforced"; (4) a "great portion of the property * * * will be paved and used for off-street parking, and consequently the erection of the shopping center will not materially change the existing traffic situation"; (5) when the "present zoning ordinance was passed, shopping centers had not yet come into existence and, therefore, no provision was made for them," and under the "present zoning ordinance" "there is no area in which a planned shopping center can be constructed because of the fact that the Township is 'strip zoned' for business to a depth of only 100 feet, except in one or two isolated areas"; (6) an inspection of the *locus* "reveals that the location of the lot, its appearance and the atmosphere created by the surrounding uses made of the land, fit the pattern of the area for the development of the tract in question as a shopping center with off-street parking"; (7) the plans submitted to the board provide for the "erection of a brick, Colonial-type building, beautiful in design," with a "shrubbed" area, "thus enhancing the appearance of the neighborhood in general," and the "brightly-lighted used car lot presently on the Boulevard frontage of the property" will be eliminated, and the "public welfare will be served beneficially" by the demolition of the "existing unsightly structure" which because of age and "lack of maintenance over many years, as well as its use for large public gatherings, has made it a source of public concern for some time"; and (8) the variant use will not "detrimentally" affect the "value of the properties in the scattered residential area"; the "maintenance of the open area for off-street parking will promote the general welfare of the community by lessening congestion on the streets and providing the maximum of light and air"; the "plan for the development of the property in question is advisable as the most economical use of the property in the interest of the Township of North Bergen and in keeping with the intent and spirit of the zoning ordi-

nance"; the "erection of the planned shopping center with some 33 or 34 tenants will produce substantial ratables for the Township, both real and personal, and will impose no financial burden for the erection of additional schools which would result if the premises were developed for residential purposes."

In conclusion, the board found, "as a matter of fact, that the relief sought is in the public interest and can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance."

The governing body "approved" the "recommendation" "for the reasons" given by the board of adjustment.

The Law Division of the Superior Court sustained the variance; and the Appellate Division affirmed the judgment, 36 *N. J. Super.* 586 (*App. Div.* 1955), generally on the ground that if "substantial evidence is adduced tending to show that the variance will subserve one or more of the zoning objects specified by the Legislature for municipal zoning legislation in *R. S.* 40:55–32 and that the relief can be granted without substantial detriment to the public good or substantial impairment of the intent and plan of the zone plan and ordinance, and specific findings in support of both of these prerequisites are made by the board, the variance will stand," and here "Some of the findings of the board were in affirmative relationship with such zoning objectives and considerations as lessening street congestion, the character of the area, the peculiar suitability of the parcel for the use applied for, conservation of land values, the most appropriate use of the land and the general welfare of the community."

And it was said that the "existence of some degree of hardship to the owner in the strict application of the ordinance to the property may also be given consideration by the local board in such cases and the hardship need not be of the kind or to the extent specified by the statute for relief under paragraph (c) of *N. J. S. A.* 40:55–39," but that "mere hardship, * * * unaccompanied by the promotion of one

or more of the zoning objectives stated in *R. S.* 40:55–32" would not "suffice in a paragraph (*d*) case." It was found that there was "evidence of hardship to the owner in strict enforcement of the ordinance"; and that "Other findings contributed to the conclusion of the board that there would be no substantial impairment of the zone plan or detriment to the public good"; but no opinion was expressed "as to the legal adequacy of the eighth finding, that relating to considerations as to tax ratables and municipal financial burdens." The holding was that the other findings "were legally apt and substantially supported by evidence," and "The insufficiency of one finding will not impair the efficacy of others which are adequate."

But the judicial authority cannot say that the latter considerations, one or both, were not in themselves decisive. Upon what reasoning can it be hypothesized that such were not constituent elements of the determination? Would the recommendation of a variance have been made were these factors ruled out as alien to the statutory policy and wholly inadmissible as a standard or rule of action, and the board had been so advised? The formal findings of the board render it quite certain that these were deemed reasons of prime import in resolving on the course of action taken. And they were utterly illusory. Mr. Sarubbi, a member and the secretary of the board of adjustment, testified: "That has been the trouble with all municipalities. They have allowed housing and everything else to go up. Now, they realize that the school proposition was really knocking their brains out. That is one reason when this thing came before our board the merits of the case were terrific, really terrific. That is one of the main reasons we went along with this proposition."

It is not *per se* a sufficient reason for a variation of the general rule that the nonconforming use would be more profitable to the landowner. The converse course would subvert the principle of zoning. The statute, *R. S.* 40:55–32, permits the exercise of zoning power for the conservation, not the enhancement, of the "value of property." *Brandon*

*v. Montclair*, 124 *N. J. L.* 135 (*Sup. Ct.* 1940), affirmed 125 *N. J. L.* 367 (*E. & A.* 1940); *Berdan v. City of Paterson*, 1 *N. J.* 199 (1948); *Beirn v. Morris*, 14 *N. J.* 529 (1954). And the intrusion of a forbidden business use in a residence zone, by means of a variance, to increase the tax ratables, real or personal, is equally inadmissible. Such a course would contravene the constitutional and statutory principle of zoning by districts in accordance with the character of the lands and structures and their peculiar suitability for particular uses, and uniformity of use within the division. It would make for "spot zoning" and the disintegration of zone classification. *Brandon· v. Montclair, supra; Collins v. Board of Adjustment of Margate City*, 3 *N. J.* 200 (1949); *Schmidt v. Board of Adjustment of Newark*, 9 *N. J.* 405 (1952); *Potts v. Board of Adjustment of Princeton*, 133 *N. J. L.* 230 (*Sup. Ct.* 1945). It is basic to zoning policy that all property in like circumstances be treated alike. The use restraints must needs be general and uniform in the particular district. *Beirn v. Morris*, cited *supra*. This, in virtue of the legislative grant itself, quite apart from constitutional precept for the fulfillment of essential civil liberties. The zoning power, as in the case of all other exertions of the police function, is controlled by the rule of reason; capricious action is forbidden. There cannot be arbitrary deviation from the general rule of the enabling statute or the ordinance. *Katobimar Realty Company v. Webster*, 20 *N. J.* 114 (1956).

And, *a fortiori*, it would be a palpable misuse of the board's administrative function to provide for a business use of this tract, zoned for residences by the local legislative authority, in order to avoid the cost of school facilities and administration were it devoted to the ordained use. Nor could the board, by means of a variance, supply the omission from the ordinance of provision for "shopping centers," a use that had not come into vogue when the ordinance came into being, so it is said. Use classification is a legislative province; and the board has no legislative power whatever. *Brandon v. Montclair, supra; Lynch v. Hillsdale*, 136 *N. J. L.* 129 (*Sup. Ct.* 1947), affirmed 137 *N. J. L.* 280 (*E. & A.*

1948) ; *Visco v. Plainfield*, 136 *N. J. L.* 659 (*Sup. Ct.* 1948).
See also *Flynn v. Zoning Board of Review*, 77 *R. I.* 118, 73
*A.* 2*d* 808 (*Sup. Ct.* 1950).

■■ In the board's view the "exception" is confounded
with the "variance." An "exception" concerns the legislative
function. It is allowable to serve the general good and
welfare rather than individual interests merely; but the
conditions for such special use must be found in the local
legislative act and may not be varied. *Schmidt v. Board of
Adjustment of Newark, supra; Stone v. Cray*, 89 *N. H.* 483,
200 *A.* 517 (*Sup. Ct.* 1938) ; *Flynn v. Zoning Board of
Review, supra.* Exceptions involve the exercise of an original
jurisdiction for the accommodation of zoning practice and
public needs exceptional in nature, and thus reasonably to
advance the essential common interest as an integral part
of the zoning process to the same end.

Such is the significance of subdivision (*b*) of *R. S.* 40:55–
39, as amended by *L.* 1953, *c.* 288. The board is thereby
empowered to hear and decide "requests for special excep-
tions" "in accordance with the provisions" of the local zoning
ordinance. Subsection (*d*) provides for the "granting of a
variance" to "allow a structure or use in a district restricted
against such structure or use," in "particular cases and for
special reasons." Subsection (*c*) authorizes a "variance"
where the "strict application" of the general regulation
"would result in peculiar and exceptional practical diffi-
culties to, or exceptional and undue hardship upon the
owner" of a "specific piece of property," provided that "no
variance shall be granted under this paragraph to allow
a structure or use in a district restricted against such struc-
ture or use."

■■ A "variance" presupposes the reasonableness of the
zone regulation as a whole. General hardship is relievable
only by a revision of the general rule of the ordinance or by
the judicial process. Such is the nature of the statutory
"variance" as distinguished from the "exception" provided
for in subsection (*b*). A "variance" is a relaxation of the
general rule of the ordinance to alleviate conditions peculiar

to a particular property, and thus to permit a use to which it is adapted and avoid an undue invasion of the right of private property by compelling conformance to an unsuitable permissible use, a burden upon the individual landowner that would be disproportionate to the common need. It has reference to a property uniquely circumstanced. This accommodation of public and private interests is in keeping with the statutory principle of use zoning by means of "general laws" and a "comprehensive plan." The disintegration of the established use districts is the price of deviation from the principle. *Beirn v. Morris, supra; Dolan v. DeCapua,* 16 *N. J.* 599 (1954); *Visco v. Plainfield, supra.*

As Mr. Justice Burling lately said, subdivision (*d*) was not intended "to encompass what is known in zoning law as an 'exception.' * * * The exception procedure is safeguarded by standards set forth in the ordinance." *Ranney v. Istituto Pontificio Delle Maestre Filippini,* 20 *N. J.* 189 (1956). See *Yokley on Zoning Law and Practice, section* 133; also *Metzenbaum's Law of Zoning* (*2d ed.*), 815, *et seq.,* and the cases there collected.

The remaining grounds assigned by the board for the action taken are equally untenable.

The "shape" of the tract, its width of 370 feet on the Boulevard, its irregular depth, and the so-called limited access do not render its use for residences unfeasible or impracticable. We find no evidence to support the finding that the area may not be subdivided for "residential purposes." But certain it is that the land is usable for apartment dwellings. There is no substantial ground to believe that access comporting with the need will not be available should a residence use be made of the land. As stated, the area to the west of the business "strip" fronting the Boulevard is zoned for residence use as a matter of general policy; and multi-story apartment houses are operating in the neighborhood under somewhat similar conditions. Such would seem to be the highest and best use of the *locus.* As said by Mr. Justice Brennan, in a case where the "exceptional shape" of the plot was offered as a ground for a variance: "Mere irregularity in contour is not the test. The statute con-

templates proof that the property because of its shape cannot reasonably be put to the permitted use in the manner of properties generally in the district." *Leimann v. Board of Adjustment of Cranford Township*, 9 *N. J.* 336 (1952). And it was there also held that "difficulty of access to the rear of the property" is not to be deemed extraordinary and exceptional within the statutory intendment when the landowner has the means of correcting it.

The commercial enterprises in the neighborhood are all in a business zone or constitute nonconforming uses which are not good cause for a variance. *Beirn v. Morris, supra.* As said, the general regulation itself is not assailed as an arbitrary or unreasonable exercise of local legislative power. It is the accepted view that zoning is designed "to preserve the true character of a neighborhood by excluding new uses and structures prejudicial to the restricted purposes of the area, and gradual elimination of such existing structures and uses." *Yokley's Zoning Law and Practice* (2d ed.), *section* 11.

Plainly, the dominant considerations for the granting of the variance involved the exercise of the legislative power, wholly beyond the board's province; and, in respect of matters peculiar to the particular property, the action taken would work substantial impairment of the "intent and purpose of the zone plan and zoning ordinance," according to the test of *Ward v. Scott*, 11 *N. J.* 117 (1952); *s. c.* 16 *N. J.* 16 (1954), and so it is arbitrary and unreasonable. Here, the zone plan is embodied in the ordinance. See Professor Haar's treatise, *In Accordance With a Comprehensive Plan*, 68 *Harvard L. Rev.* 1154. But the grounding of the variance in matters purely legislative in itself invalidates the action taken.

The judgment of the Appellate Division is reversed; and the cause is remanded with direction to vacate the variance.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, BURLING and BRENNAN—4.

*For affirmance*—Justices OLIPHANT, WACHENFELD and JACOBS—3.