LUCILE M. ANDREWS, *ET AL.*, PLAINTIFFS-APPELLANTS, v. BOARD OF ADJUSTMENT OF THE TOWNSHIP OF OCEAN, *ET AL.*, DEFENDANTS-RESPONDENTS.

Argued April 21, 1959—Decided June 30, 1959.

*Mr. Maurice A. Potter* argued the cause for plaintiffs-appellants (*Messrs. Potter and Fisher,* attorneys; *Mr. Maurice A. Potter,* of counsel and on the brief).

*Mr. Robert V. Carton* argued the cause for defendants-respondents (*Messrs. Stout & O'Hagan,* attorneys for Board of Adjustment of Township of Ocean and Township Committee of the Township of Ocean; *Messrs. Durand, Ivins & Carton,* attorneys for St. Mary's Church; *Mr. Robert V. Carton,* of counsel).

The opinion of the court was delivered by

WEINTRAUB, C. J. This is a zoning case. By a vote of 3 to 1, the board of adjustment recommended a variance under subsection (*d*) of *N. J. S. A.* 40:55–39 to permit the use of residential premises for a parochial school with living quarters for teachers. The governing body approved. Owners of neighboring property, having failed in their attack in the Law Division, 51 *N. J. Super.* 69 (1959), prosecuted this appeal. We certified the matter on our motion before the Appellate Division considered it.

The zoning ordinance establishes eight residental and two business districts. The required plot size in residential districts ranges to a maximum of 40,000 sq. ft. in Residence A. The property in question, known as Ivy Hedge, is one of some nine separate ownerships comprising a Residence A district. Ivy Hedge embraces about 16 acres, fronting on the westerly side of Wickapecko Drive for a distance of about 617 ft. and extending westerly with side lines of 1,022 ft. and 1,059 ft. to a rear line of 339.50 ft. On the same side of the street, a 30-acre tract of vacant land lies north of Ivy Hedge; to the south are two parcels with substantial homes. South of the two parcels last mentioned is a Residence E district containing a subdivision development, a women's club, a community day school, and

a public school. To the west and south of the rear portion of Ivy Hedge is another subdivision development in a Residence E district. The minimum plot requirement of the Residence E districts is 12,500 sq. ft. On the easterly side of Wickapecko Drive, across from the premises in question and constituting the balance of the Residence A district here involved, are valuable estates owned by plaintiffs.

The residence on the property in question erected in 1900 contains 17 rooms, plus 6 bathrooms, and 2 powder rooms. The structure is well set back from the property line. The variance is conditioned as follows:

"1. That the exterior of the existing building not be changed or altered;

2. That the property east of the building known as the front yard shall be maintained in its present state of landscaping;

3. That the main entrance and exit for school purposes shall be limited to the extreme westerly portion of the property known as the rear;

4. That any public area, playgrounds, athletic field, etc. be established to the rear of the existing building;

5. St. Mary's Parish would accept the children of Ocean Township who are now attending other parochial schools;

6. That St. Mary's Parish install at its own cost and expense a sanitary sewer line to connect with existing sewer system according to specifications and places as determined by the Township Engineer. Further, that all main lines on existing streets be dedicated to the Township of Ocean; and

7. That the convent and parochial school shall be limited to the existing main building."

The ordinance permits in all districts "apartment houses, garden apartments, apartment hotels, hotels, boarding houses, municipal buildings, churches, public schools, including playgrounds and accessory buildings, public parks, and public playgrounds" upon, however, the recommendation of the board of adjustment to the township committee "under the same procedure as the Board of Adjustment is empowered by law and ordinance to hear cases and make exceptions to the provisions of a zoning ordinance * * * if in its judgment the use * * * will not be detrimental to the health, safety and general welfare of the community

and is reasonably necessary for the convenience of the community." A parochial school, however, is not within the category of uses thus permitted. Rather it comes within "private schools or other educational institutions, whether or not conducted for profit," which are authorized in business districts upon prior application to the board of adjustment under the same provisions with respect to "exceptions" quoted above.

■ A parochial school thus being unauthorized in residential districts, a variance was sought under (d) of N. J. S. A. 40:55–39. The cited statute reads:

"The board of adjustment shall have the power to:
\* \* \* \* \* \* \* \*
d. Recommend in particular cases and for special reasons to the governing body of the municipality the granting of a variance to allow a structure or use in a district restricted against such structure or use. Whereupon the governing body or board of public works may, by resolution, approve or disapprove such recommendation. \* \* \*
No relief may be granted or action taken under the terms of this section unless such relief can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance."

Two critical findings are required by the statute: (1) that the variance "can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance"; (2) that "special reasons" exist for the variance. Both findings were made by the board of adjustment in adequate factual detail and with ample support in the record.

As to the first requirement, the school of course involves no inherent "detriment to the public good." And in the scene before us it was reasonably found that there will be no substantial impairment of the "intent and purpose of the zone plan and zoning ordinance." The ordinance contemplates uses other than one-family homes. As pointed out above, apartment houses, garden apartments, apartment hotels, hotels, boarding houses, churches, public schools and public playgrounds are authorized upon prior application

to the board of adjustment. Hence the use here permitted is not dramatically different from those envisioned in the zoning plan. Nor, upon the record, can we quarrel with the finding that neighboring properties will not be injured. Ivy Hedge is a large tract, and the carefully conceived conditions of the variance, see *Grimley v. Ridgewood*, 45 *N. J. Super.* 574, 577 (*App. Div.* 1957), will contain the influences of the school within the perimeter of the property. In affirmative terms, some possible advantages may be added. The variance will preserve the attractive character of the premises against pressures, evident from the subdivision developments mentioned above, to raze a beautiful but uneconomic type of residence and to subdivide the tract. Thus the variance may well prove to be a buffer for the remaining properties in this relatively small Residence A district.

Plaintiffs concentrate their attack upon the second critical finding, the existence of "special reasons." They argue relief may not be granted in the absence of hardship, some zoning burden peculiar to the property in question and not common to the entire district, citing *Lumund v. Board of Adjustment*, 4 *N. J.* 577 (1950); and *Beirn v. Morris*, 14 *N. J.* 529 (1954). Both cases, however, involved subsection (*c*) of the statute in which "exceptional and undue hardship upon the owner of such property" is a basis for variance. In *Monmouth Lumber Co. v. Ocean Twp.*, 9 *N. J.* 64, 77 (1952), it was pointed out that subsection (*d*) contains no such prerequisite. In *Ward v. Scott*, 11 *N. J.* 117 (1952), in which this court divided 4 to 3, *Monmouth Lumber* was followed, and the claim of unconstitutionality for want of a sufficient standard was rejected. The majority held that "special reasons" gained validating content from the purposes of zoning specified in *R. S.* 40:55–32. In the second *Ward v. Scott*, 16 *N. J.* 16, 18 (1954), the majority view was iterated, and it was pointed out that after the first opinion in that matter the Legislature amended (*c*) restrictively but did not alter (*d*). And in *Dolan v. DeCapua*, 16 *N. J.* 599 (1954), the court

noted that although hardship may constitute a special reason it did not exhaust the subject. Neither *Ranney v. Istituto Pontificio Delle Maestre Filippini,* 20 *N. J.* 189 (1955) nor *Moriarty v. Pozner,* 21 *N. J.* 199 (1956), questioned *Ward v. Scott* but rather turned upon other considerations including impairment of the zoning scheme. Recently we again expressed adherence to this interpretation of (*d*). *Grundlehner v. Dangler,* 29 *N. J.* 256, 265–268 (1959).

As pointed out in *Grimley v. Ridgewood, supra* (45 *N. J. Super.* at *page* 581), no definition of "special reasons" has been attempted beyond the reference to *R. S.* 40:55–32. In the nature of the subject, a precise formula is not feasible. Each case must turn upon its own circumstances.

The standard of *section* 32 here pertinent is the "general welfare." That the education of children directly furthers the "general welfare" cannot be questioned. The education here to be provided is an accepted equivalent of public schooling. A need exists. Presently the community's children of the Catholic faith attend a parochial school in Asbury Park, the facilities of which are hard pressed because of swelling population, as indeed are those of the public school in the township itself.

The local authorities could properly conclude that a special reason for a variance here exists, and since this finding, as well as the equally critical finding that there will not ensue any substantial detriment to the public good or substantial impairment of the zoning plan and ordinance, cannot be denounced as arbitrary or capricious, there is no basis for judicial intervention. *Grundlehner v. Dangler, supra* (29 *N. J.* at *page* 266).

Plaintiffs complain the school will serve the entire parish of which the township is but a part. No infirmity inheres in that circumstance. A municipality may provide cooperatively for the needs of neighboring communities as well as its own. See *Kozesnik v. Township of Montgomery,* 24 *N. J.* 154, 162–163 (1957); *Fanale v. Borough of Hasbrouck Heights,* 26 *N. J.* 320, 328 (1958).

One further matter requires comment. Before the trial court defendants, or one of them, apparently injected a claim, not within the pleadings, that constitutionally the zoning treatment of public and parochial schools must be identical. The trial court apparently read *Yanow v. Seven Oaks Park, Inc.,* 11 *N. J.* 341, 36 *A. L. R. 2d* 639 (1953), *annotated* in 36 *A. L. R. 2d* 653 (1954), to support that view and intimated that St. Mary's Church could have sought a permit under the terms of the ordinance itself upon an equation of a parochial school with a public school (51 *N. J. Super.* at *page* 73). The court, however, then dealt with the cause as one involving a variance and affirmed on that basis.

We express no view of the constitutional issue since it is not necessarily involved. No doubt a municipality may legislatively determine to include public and private schools in a single category for zoning purposes, and *Yanow* approves that course. But there are differences which may well support another approach. In weighing its obligation to provide public education against some ensuing hurt to residential property, a municipality may decide to accept some detriment in order to furnish such education with reasonable convenience to the several areas of the community. It may, however, be proper to strike a different balance when weighing a detriment to a residential district against the need for a private school which draws its students from the entire community or from beyond its borders. Moreover, the governmental unit is politically responsible to the public for its selection of a school site and hence is alert to the various facets of public interest involved in its decision. If need be, it may resort to eminent domain to secure the appropriate location. On the other hand, a private school may not have an equivalent sense of obligation to consider the interests of others and in any event is limited to parcels available to it by voluntary sale. We need not and hence do not express an opinion upon the question. It may, however, be appropriately noted that here, in dealing with an application for a variance, there was brought to bear the

independent judgment of the board of adjustment and of the governing body that the use under the facts is compatible with the total public interest.

The judgment of the Law Division is affirmed.

HALL, J. (dissenting). There was no showing or claim before the board of adjustment here of any present zoning burden peculiar to the property in question by reason of the requirements of the ordinance limiting the basic use in this Residence A district to single-family dwellings on plots of at least 40,000 square feet in area. Nor was it even attempted to be demonstrated that if Ivy Hedge should become uneconomic to maintain as an estate in the future, its 16 acres could not be subdivided and used pursuant to the ordinance. Likewise, there was no evidence of non-conformity or present or prospective deterioration of the other substantial houses in the district. On the contrary, clearly inferable from the proofs is the present desirability and marketability of the lands and houses in this district for country estate purposes. One of the homes close to the subject property had only recently been constructed at a cost of $150,000. The majority holds, for the first time in a clear case of this type I submit, that a burden is not a necessary element of the "special reasons" requirement for a variance from use regulations under *N. J. S. A.* 40 :55–39(*d*).

This result, it is indicated, is dictated, on the theory of legislative intent, by the various amendments to section 39 since 1948. *L.* 1948, *c.* 305, § 6; *L.* 1949, *c.* 242, § 1; *L.* 1953, *c.* 288, § 1. Our law on the subject appears to be finally settled after a series of decisions in this court since that date. *Monmouth Lumber Co. v. Ocean Township,* 9 *N. J.* 64 (1952) (*dictum*), *Ward v. Scott,* I and II, 11 *N. J.* 117 (1952), 16 *N. J.* 16 (1954), and *Grundlehner v. Dangler,* 29 *N. J.* 256 (1959), pointed strongly toward the destination now reached, but none involved the question as sharply as it is now presented. But *Moriarty v. Pozner,*

21 *N. J.* 199, decided in 1955 in the middle of the other cases, held:

"A 'variance' [as distinct from an exception] is a relaxation of the general rule of the ordinance to alleviate conditions peculiar to a particular property, and thus to permit a use to which it is adapted and avoid an undue invasion of the right of private property by compelling conformance to an unsuitable permissible use, a burden upon the individual landowner that would be disproportionate to the common need. It has reference to a property uniquely circumstanced. This accommodation of public and private interests is in keeping with the statutory principle of use zoning by means of 'general laws' and a 'comprehensive plan.'" 21 *N. J.* at *pages* 210–211.

I take it that *Moriarty* is now definitely overruled in this respect.

That decision was in perfect line with our cases prior to the amendments beginning with the leading case of *Brandon v. Board of Com'rs of Town of Montclair,* 124 *N. J. L.* 135 (*Sup. Ct.* 1940), affirmed 125 *N. J. L.* 367 (*E. & A.* 1940). See also to the same effect *National House & Farms Ass'n, Inc. v. Board of Adjustment of Oakland,* 2 *N. J.* 11 (1949); *Ramsbotham v. Board of Public Works of Paterson,* 2 *N. J.* 131 (1949); *Protomastro v. Board of Adjustment of Hoboken,* 3 *N. J.* 494 (1950); *Stolz v. Ellenstein,* 7 *N. J.* 291 (1951); *V. F. Zahodiakin Engineering Corp. v. Zoning Board of Adjustment of Summit,* 8 *N. J.* 386 (1952). It was likewise in conformity with the inherent philosophy and function of a variance and the law in practically every other state, generally irrespective of what the particular language of the local statute might be. *Bassett, Zoning* (1940), *pp.* 124–28; 1 *Yokley, Zoning Law and Practice* (*2d ed.* 1953), *secs.* 131–145; 1 *Metzenbaum, Law of Zoning* (*2d ed.* 1955), *pp.* 766–797; 1 *Rathkopf, The Law of Zoning and Planning* (*3d ed.* 1956), *pp.* 647–675; *Rhyne, Municipal Law* (1957), *pp.* 855–74.

I do not conceive that our statutory amendments, although confusing, vague and completely unique (see *Zoning Advances, Regional Plan Association Bulletin* 86, May 1956,

*p*. 26), indicated any change in legislative intent or necessitated the variation from our former law now brought to complete fruition. *R. S.* 40:55–39, when originally adopted in 1928 (*L*. 1928, *c*. 274, § 9) was, like the statutory provisions of many other states, a local adaptation of the standard state zoning enabling act prepared by the United States Department of Commerce in 1924, which incidentally had been substantially followed in our first statute enacted the same year (*L*. 1924, *c*. 146, § 7). The 1928 law provided in (*b*) for exceptions, and in (*c*) and (*d*) for variances. The difference between (*c*) and (*d*) did not relate to criteria but only to requiring that the governing body had to approve where a use variance was granted for property which did not abut the district where the proposed use was permitted or was not within 150 feet of it, the board of adjustment having the sole and complete power where it did. The criterion was the same, and has so been held to be, in both situations, expressed only in (*c*) in this language taken verbatim from the standard act: "such variance from the terms of the ordinance as will not be contrary to the public interest, where, owing to special conditions, a literal enforcement of the provisions of the ordinance will result in unnecessary hardship, and so that the spirit of the ordinance shall be observed and substantial justice done. * * *"

Time does not permit tracing the detailed course of language changes and rechanges by the three amendments, but when one looks at the final product in the light of the fundamental concept of a variance, I can only believe, despite contrary expressions in the previously cited cases decided before I became a member of the court, that the Legislature intended the criterion of "special reasons" in (*d*) to still refer back to and be controlled by the "hardship" and "difficulties" requisite in (*c*). (We still retain the same idea of the division of local agency power initiated in 1928, but in a slightly different form, so that now the board of adjustment can act completely only when a use variance is not involved and the governing body must approve when it is.)

The fundamental philosophy and design of the zoning process is of paramount importance in interpreting such statutes or amendments and should control in case of doubt as to the meaning of statutory language. Additionally, the majority interpretation produces the peculiar result that where a minor variation from the ordinance is sought under (c), hardship and difficulty must be shown, but where the infinitely greater use variance is applied for under (d), much less will suffice. I feel sure the Legislature could not have intended this.

If "special reasons" does not mean at least burden on the property involved, I submit there is no sufficient clue available anywhere as to what it does mean. And that leads me to my next point of difference. In *Ward v. Scott,* I, *supra,* this court sought to save (d) from extinction for lack of standards (and again New Jersey is the only state with such language in its statute) by saying, in effect, that a sufficient special reason could be found if the variance would serve any of the purposes of zoning listed in the first sentence of *R. S.* 40:55-32. That has led to the holding here that a variance must be sustained, as far as the "special reasons" requirement is concerned, if the board of adjustment finds from the proofs that the proposed use will promote the "general welfare," *i. e.,* that it is a desirable thing for the community or a segment of it at the location requested. Such a broad view, it seems to me, may well result in the theory being applicable by the same reasoning not only to the eminently desirable parish school as here, but also to a commercial enterprise in a residential zone, with paramount affirmative consideration given only to the general desirability or convenience of it and with little regard to the zoning effects at such location. In other words, zoning considerations are relegated to a minor role.

It further seems to me that "general welfare," as used in *section* 32, was not intended to have the connotation now placed upon it. See *Skaf v. Zoning Board of Adjustment of Asbury Park,* 35 *N. J. Super.* 215, 224 (*App.*

*Div.* 1956). (I take it that *Skaf,* involving a women's club of civic benefit, is now also overruled).

More important, my view is that, in holding there is a sufficient special reason if the proposed use will promote one of the objects of zoning listed in *section* 32, those objectives are taken out of their proper context, with complete disregard and practical nullification of the more controlling requirements that regulations shall be uniform throughout each district (*sec.* 31) and "shall be in accordance with a comprehensive plan" and "made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality." (*sec.* 32).

By the sweep of the majority opinion it appears we will have almost untrammeled discretion in the local administrative agencies to grant a use variance under so-called standards so broad that almost every variance allowed will have to be sustained. The use restrictions of the ordinance have become a rather coarse sieve. I am convinced that the basic concept of use zoning by districts in accordance with a comprehensive plan will consequently, for all practical purposes, disappear and that spot zoning has in effect been given legal blessing. See *Zoning Advances, op. cit., p.* 26; *Haar: "In Accordance with a Comprehensive Plan,"* 68 *Harvard L. Rev.* 1155, 1166 (1955).

Where, as here, we do not have a case of misfit character of land sought to be used, the question remains as to how to handle uses of a public or semi-public nature, which the sense of the particular community feels to be of general civic benefit and so should be allowed at a location appropriate to the nature of the use. According to my thesis, the variance technique is not intended or appropriate. The matter is one that must be taken care of in some fashion by the ordinance. If the municipality does not want to sanction such uses absolutely and unqualifiedly in a residential zone,

for example (in which case every purchaser would be put on notice that he might later have a school, church or playground next door and would have no zoning reason to complain about it), the available and intended device is the exception provided for in (*b*) of section 39. *Tullo v. Millburn Township,* 54 *N. J. Super.* 483 (*App. Div.* 1959); see *Moriarty v. Pozner, supra* (21 *N. J.* at *page* 210); texts as previously cited; *"Zoning Ordinances Versus Exceptions,"* 82 *N. J. L. J.* 312 (June 18, 1959). As was said in *Tullo:*

"The theory is that certain uses, considered by the local legislative body to be essential or desirable for the welfare of the community and its citizenry or substantial segments of it, are entirely appropriate and not essentially incompatible with the basic uses in any zone (or in certain particular zones), but not at every or any location therein or without restrictions or conditions being imposed by reason of special problems the use or its particular location in relation to neighboring properties presents from a zoning standpoint, such as traffic congestion, safety, health, noise, and the like. The enabling act therefore permits the local ordinance to require approval of the local administrative agency as to the location of such use within the zone. If the board finds compliance with the standards or requisites set forth in the ordinance, the right to the exception exists, subject to such specific safeguarding conditions as the agency may impose by reason of the nature, location and incidents of the particular use." (54 *N. J. Super.* at *pages* 490–491.)

The stress is quite properly laid on the zoning aspects of an admittedly desirable use, *i. e.,* the location and incidents thereof, and not on the immaterial factor of any present zoning burden on the property sought to be so used.

Ocean Township has attempted to use this technique with respect to both public and private schools, but its ordinance is a zoning misfit and that is a primary difficulty in the instant case. Quite apart from the constitutional question of discrimination in treatment between public and private schools adverted to by the Chief Justice (on which the authorities in other jurisdictions are divided), to me the provision allowing private schools as special exceptions, but only in business zones, does not make sound zoning sense,

especially in this municipality where, aside from a few microscopic neighborhood business districts, all the land zoned for that purpose borders on busy through highways,— quite inappropriate locations for a school of any kind. In this largely rural but developing township where at least 98% of the land is zoned for residential use in various classifications, there are without question many locations where a parish school, without doubt a desired and desirable use which should be allowed in this township, could be conveniently located under such restrictions as would sufficiently remove the impact of the use from injuriously affecting the value or enjoyment of the properties of neighboring landowners. Different considerations and legal results might well follow if the municipality were largely or completely built up.

What I conceive the trial judge actually did here was to tacitly recognize the misfit character of the ordinance, and in order to make it unnecessary for the applicant to seek an amendment or to attack the ordinance directly, then treated the situation as if the ordinance allowed private, as well as public schools, as exceptions in a residential zone and considered the application as one for an exception. He made his own findings of fact on that theory (51 *N. J. Super.* at *pages* 74–75), rather than reviewing those made by the board as is the proper practice. Regardless of all of this, both sets of findings state that use of Ivy Hedge for a parochial school "would not adversely affect the value of properties in the area" and the board concluded in the statutory language that the use would be "without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance." The negative criteria of section 39 just quoted are equally applicable to variances and exceptions. They certainly mean, at the least, as the majority indicates, that the proposed use, with any conditions and restrictions imposed thereon, will not injure neighboring properties. This requisite is of paramount importance in both situations, for

if it does not exist, one party is benefitted without legal warrant at the sole expense of another—the antithesis of zoning. Whether the present application is treated as a variance or an exception, I am of the opinion that the proofs before the board do not sustain the finding. My consequent disagreement with the majority is irrespective of the views I have previously expressed concerning the other legislative requisites for a variance.

The record before the board was one-sided and, although appellants make no point of it, it seems to me the objectors were refused, quite unjustifiably I think, a continuance of the hearing to present additional witnesses in opposition. As so often happens, the applicant presented a thoroughly prepared case, as strong as it could be made under the circumstances. There being no pleadings or opportunity for discovery in advance of the hearing, an objector cannot know what proofs he has to meet, especially in the line of expert testimony. If he is not allowed a continued hearing date after hearing the theory, contentions and evidence of the applicant for the first time, he is generally deprived of any real chance to properly and thoroughly present his side of the case. The offer of the trial judge to plaintiffs to present additional evidence to him (51 *N. J. Super.* at *page* 75) is no effective substitute and would in fact be incongruous in the light of the established limitations on judicial review of the determination of administrative agencies. *Tomko v. Vissers*, 21 *N. J.* 226 (1956).

Analysis of the record before the board indicates to me that the only real evidence bearing on these negative criteria was that given by the applicant's two expert witnesses, one in the real estate field and the other a planner. As to the former, while he made the bald statement that school use would not reduce the *value* of the surrounding property, his detailed testimony indicated that he reached that conclusion largely on the basis of his experience with vacant land in other sections which had been increased in value for development purposes by the erection of a school

in the vicinity. Such is certainly not a situation comparable to this established estate district and I would say his bare conclusion is unsupported. His testimony must also be considered in the light of his rather strange assertion that the best and most appropriate use of Ivy Hedge is for a school.

The testimony of the planning expert was confined largely to the expression of opinion that the use would be · in furtherance of the morals and general welfare of the community (which is obvious) and that it would not be contrary to the spirit of the zone plan and ordinance but in furtherance of the purposes of zoning. The latter, as well as his expressed view that the surrounding area would be enhanced, seems to have been rested entirely on the basis that schools are necessary and that the particular facilities involved "are needed as an element in community life." This is quite beside the point. It should also be borne in mind that the testimony showed that, while the dwelling is presently adequate for four grades and living quarters for the nuns, the future plan was for a full elementary school which would require additional building on the plot.

The only witness for the objectors was one of the estate owners, who had acquired his property about a year before. He said he would not have purchased if there had been a school on the proposed site, that he felt the proposed use would reduce the value of his property and that it would interfere with the *enjoyment* thereof by additional traffic on the street and by making it less desirable for residential purposes. While no opposition expert testimony was offered, the opinion of this owner, himself in the real estate business in another locality, appears certainly entitled to preference over that offered by the applicant (which had the burden of proof) and which, as has been pointed out, was either not pertinent on the issue or without support in any comparable situation.

There was therefore, in my opinion, insufficient evidence to support the conclusion that there will be no injury to

neighborhood properties in this established country estate section and that the negative criteria were satisfied. I am convinced that the proofs show the property in question is not an appropriate place for any kind of a school from the standpoint of zoning requisites. Quite the opposite should be the result, however, were the proposed location outside the immediate area of these homes as, for example, on the northerly end of the vacant land at that extremity of the zone.

I would therefore vote to reverse the judgment of the trial court and direct that the granted variance be set aside.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS and PROCTOR—5.

*For reversal*—Justice HALL—1.