67 N.J. Super. 460 (1961)
171 A.2d 8
A. LEROY MILLER, PLAINTIFF-RESPONDENT,
v.
THE BOARD OF ADJUSTMENT OF THE TOWNSHIP OF BOONTON, ET AL., DEFENDANTS-RESPONDENTS, AND DIXON ASSOCIATES, INC., ETC., DEFENDANT-APPELLANT. DIXON ASSOCIATES, INC., ETC., PLAINTIFF-APPELLANT,
v.
THE BOARD OF ADJUSTMENT OF THE TOWNSHIP OF BOONTON, ET AL., DEFENDANTS-RESPONDENTS, AND A. LEROY MILLER, INTERVENOR-DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 23, 1961.
Decided May 15, 1961.
*463 Before Judges GOLDMANN, FOLEY and DRENK.
Mr. William P. Westling argued the cause for appellant (Messrs. Slingland, Houman & Bernstein, attorneys; Mr. Garret C. Houman, of counsel; Mr. Westling, on the brief).
Mr. Clifford W. Starrett argued the cause for respondent A. LeRoy Miller (Messrs. Schenck, Smith & King, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Dixon Associates, Inc. ("Dixon") appeals from a judgment of the Law Division affirming the denial by the Boonton Township Board of Adjustment of its application for a variance to build a two-unit bathhouse along the southerly shoreline of Dixon's Pond on land located in an R-1 residential zone.
On May 13, 1958 the board of adjustment recommended to the township governing body that Dixon be granted a variance to build the bathhouse, on condition that its club membership be limited to 50. The township committee formally approved the recommendation on June 3, 1958, and directed the building inspector to issue the necessary building permit. Although Dixon was advised that A. LeRoy Miller, an objector, intended to appeal the decision, it nevertheless proceeded with the construction of the bathhouse. *464 (The structure has since been completed.) Miller brought an action in lieu of prerogative writs (Docket L-10576-57 P.W.) seeking to set aside the variance and to enjoin construction of the bathhouse. The application for a stay was denied, but Dixon agreed that no equities were to run in its favor by reason of the construction.
When the Miller action came on for pretrial hearing it appeared that the record of the proceedings before the board of adjustment and the township committee did not set forth sufficient findings to justify the granting of a variance. Consequently, pursuant to a consent order entered October 21, 1958, the matter was remanded to the board of adjustment for reconsideration and the making of necessary findings after public hearing. The board held hearings on November 12 and December 3, 1958. Of the five members only four participated, one member disqualifying himself.
The board again met on April 14, 1959. Only three members were present. On motion that the requested variance be recommended to the township committee for approval, the vote was 2-1 in favor. However, since less than three members of the board concurred in the decision, the vote, by virtue of R.S. 40:55-41, had the effect of resulting in a denial of the variance.
Dixon then instituted an action in lieu of prerogative writs (Docket L-14006-58 P.W.) appealing the denial of the variance. This suit was consolidated with Miller's prior action by a consent order filed August 18, 1959.
The Law Division assignment judge heard the consolidated actions on January 4, 1960, on the basis of the record below, briefs and oral argument. In his oral decision, the trial judge stated that there was a presumption in favor of the validity of the board's decision, even though the majority of those voting favored granting it. The official act of the board, he said, was a denial of the application. Its action could be set aside only upon an affirmative showing of manifest abuse of discretion. It was not sufficient that he, as trial judge, would have reached a different conclusion: it *465 had to be clearly shown that the action of the board was arbitrary, capricious or patently unreasonable. The judge did not think that the proofs went that far; "we have a situation," he said, "where honest men might reasonably differ on the merits of the question presented." Accordingly, he entered judgment on January 25, 1960 dismissing the Dixon action with prejudice; declaring invalid the recommendation made by the board of adjustment to the township committee on May 13, 1958, as well as the subsequent resolution of the township committee approving the grant of a variance; adjudging the building permit issued to Dixon in accordance with that resolution to be void and of no effect; and ordering Dixon to remove the bathhouse it had constructed on or before March 15, 1960.
Thereafter the Law Division on May 10, 1960 made an order allowing Dixon 45 days to purge itself of contempt by removing the bathhouse, as required by the existing judgment. We entered a consent order staying both the contempt order and the mandatory injunction requiring removal of the bathhouse.
Dixon contends: (1) it was error for the trial court to accord a presumption of validity to the minority vote of the board of adjustment, since the denial of the variance was by operation of the statute rather than by majority vote; (2) the trial court erred in failing to affirm the findings of the majority of the board that the construction of the bathhouse was ancillary and incidental to the valid, nonconforming recreational use of the pond, and (3) the record before the board justified the granting of a variance for "hardship" or for "special reasons" under N.J.S.A. 40:55-39(c) or (d), respectively. Dixon has also filed a supplemental brief requesting that (1) in the event the judgment under appeal is reversed, we vacate the contempt order, and (2) in the event of an affirmance, we continue the stay previously granted until Dixon is foreclosed from further appellate remedies.

*466 I.
Dixon Pond was built in 1830 to supply water power for a forge. Sometime thereafter it was used as an ice pond, and icehouses were situated on the approximate site of the bathhouse. The pond and the lands immediately around it have been in the control of members of the Dixon family since at least 1898. As early as that year, the pond and its surrounding area were used by a group known as the Dixon Pond Association (organized in 1898) for recreational purposes  mainly fishing. Originally there were only 20 members, but in the 1930's membership increased to 28. In addition, the Dixon family was allowed 20 members. This system continued from 1898 to 1955 when a new group was organized, the Dixon Pond Club. Title to the property passed from Cyrus Dixon, who died in 1936, to his estate, whose executors leased the premises to the Dixon Pond Club in January 1955. Title eventually went into Dixon Associates, Inc., incorporated about January 1958.
Dixon Associates, Inc. owns some 160 acres of land, including the pond itself. The pond covers approximately 50 acres; Dixon owns about 80 acres on one side of the pond and about 30 on the opposite side. The bathhouse is located on the 30-acre parcel, about 200 feet from the boundary line of Miller's property. Miller owns over 300 acres of land in the area, held for subdivision purposes. He has built 1,000 feet of macadam road and started construction of two homes at a cost of $44,000 and $50,000, respectively. The proposed subdivision is located about 800 feet from the site of the bathhouse.
The township zoning ordinance was adopted September 25, 1956. With respect to the R-1 residence district, article 7 provides that such district is designed for single-family residential use, but permits, among other things, accessory uses customarily incident thereto, provided they do not include any activity conducted for gain, except farming or agriculture. Article 5 deals with nonconforming buildings and uses. *467 It provides that any lawful nonconforming use which existed at the time of the passage of the ordinance may be continued, and any existing building designed, arranged, intended, or devoted to a nonconforming use may be reconstructed or structurally altered, subject to certain regulations. In the event there is a cessation of operation of any nonconforming use for a period of 12 consecutive calendar months, the use shall be presumed to be abandoned. Any building destroyed to an extent not exceeding 50% of its value at the time of destruction may be reconstructed and thereafter used only in conformity with the provisions of the zoning ordinance.
The bulk of the testimony taken before the board of adjustment related to the past uses of the pond. Russell Dixon, vice-president of Dixon Associates, Inc., testified that the Dixon Pond Association had always used the pond "the same as it is now being used for, namely, fishing, picnicking, recreation, skating and bathing and hunting." He stated that when the Association was formed there was a building approximately 125 or 150 feet from the present bathhouse, and that it was used primarily as a boathouse. This building was moved to the opposite side of the pond in 1920; it was then used as a boathouse and occasionally to change clothes for bathing. In 1957 it fell into the water and became unsafe. Russell Dixon further testified that there had been two privies, located on either side of the pond. One fell down in the winter of 1957-58 and the other deteriorated to a point where it became unusable. The old icehouse, which stood on the site of the present bathhouse, was torn down in 1950 and nothing remained except a pile of debris until the construction of the bathhouse. Dixon had never seen more than five people using the pond for bathing purposes at one time.
Gladys Stern, whose family had frequented Dixon's Pond as club members for 40 years, testified that the weeds made swimming dangerous and she had seen people swimming in the upper end of the pond only. (The present beach and *468 bathhouse are at the lower end.) She said that members were primarily interested in fishing and did not want the water disturbed by swimmers. Fred McCoy, a club member from 1950 to 1955, stated that to his knowledge neither he nor any other members went swimming during that period, nor did any of them use the boathouse to change for swimming. The main purpose of the club was fishing and camping. George Siekielski testified he was a member of Dixon Pond Association from 1949 to 1954 and that he understood it was a fishing club; swimming was not permitted. He also stated that while he was a member the boathouse was not used to change clothes. Miller himself testified he had lived in the area all his life and had never seen anyone swimming in Dixon Pond, or any structure used for the purpose of changing clothes.
Russell Dixon was then recalled and testified that members of the Dixon family and the club swam in the pond. On cross-examination he conceded that his knowledge concerning the use of the boathouse by members to change clothes was not first-hand. Melville S. Newcomb, a member of the Dixon Pond Association from 1935 on, stated he used the pond primarily for fishing, but did swim there. His children swam there also, but they were instructed not to do so when fishermen were present. He said that he and his family had changed their clothes in the boathouse. However, that structure was used primarily to house boats and boating equipment. Michael Sostwick, a club member for 17 years, testified that he swam in the pond, but thought he was the only one who did, and that he changed his clothes in the boathouse and had permitted a few friends to do the same. Bruce Dixon, the son of the original owner, saw only one club member swim in the pond but had seen some members of the Dixon family swim there.
The new bathhouse is a two-room structure with a double dressing room, one for men and one for women. It is a 34' x 10' frame building with a translucent roof. Each dressing room contains an inside toilet emptying into an *469 approved type tank. The structure has been approved by the local board of health.

II.
The general rule announced by our courts is that the decision of a local board of adjustment is presumptively correct and should not be set aside unless shown to be arbitrary, capricious or patently unreasonable. Ardolino v. Florham Park Bd. of Adjustment, 24 N.J. 94, 105 (1957).
It is now clear that the failure to obtain three affirmative votes, as required by R.S. 40:55-41, must be deemed a denial of an application for a variance, even when the vote is a tie, and the applicant may seek review accordingly. Smith v. Madison Zoning Board of Adjustment, 59 N.J. Super. 553, 558-559 (App. Div. 1960), certification denied Smith v. Kirkpatrick, 32 N.J. 352 (1960). Dixon concedes that the legal effect of a 2-1 vote in favor of a variance is a denial.
However, Dixon contends that the usual presumption of validity accorded board action should not be applied to the situation where a 2-1 vote in favor of a variance results in a "statutory denial." It is urged that a presumption of validity should attach to the majority decision, the statute notwithstanding.
It is true that the rationale for the presumption of validity, and the judicial deference accorded decisions of the boards of adjustment, is that:
"* * * Local officials who are thoroughly familiar with their community's characteristics and interests and are the proper representatives of its people, are undoubtedly the best equipped to pass intially on such applications for variance. * * *" Ward v. Scott, 16 N.J. 16, 23 (1954)
But it does not follow that to apply the presumption of validity to a "statutory denial" is inconsistent with that rationale.
*470 The Legislature must have been aware that situations might arise in which only three members of a five-man statutory board, see N.J.S.A. 40:55-36, might make a decision. In such a case, the Legislature deemed it wise to provide the minority with a veto power. In effect, this represents a concession to human fallibility. The Legislature has determined that the expertise evinced by a 2-2 or 2-1 vote in favor of a variance is insufficient. It has chosen to treat such a vote the same as a 3-0 vote against recommending a variance. In view of the legislative judgment, it follows that unless we accord the same presumption of validity to a "statutory denial" as we would accord a denial resulting from a majority vote, the legislative purpose would be defeated. The result would be that the Superior Court would review the denial of a variance without giving sufficient weight to the expertise of the local board.
Dixon also contends that the purpose of R.S. 40:55-41 is to prevent variances from being granted by cliques or minorities on the board of adjustment. Therefore, it is argued, the purpose of the statute is achieved and its force exhausted by the "statutory denial" resulting from a 2-1 vote since, and if the matter goes further, it must proceed in the Law Division where the dangers of a "backroom decision" do not exist.
The thrust of the above argument is that the "statutory denial" supplied by R.S. 40:55-41 only has validity prior to the time an appeal is taken to the Law Division. The logical consequence of this contention is that merely by taking an appeal from a 2-1 vote a litigant would be able to divest the board of its local expertise and broad discretionary powers, and thereby substitute the judgment of the Law Division in their place. We do not believe the Legislature intended such a result.
It must be concluded that the usual presumption of validity attaches to a "statutory denial" of a variance. In other words, the presumption must be accorded the veto of the minority member. Consequently, the question on this appeal *471 is whether the action of the minority member in voting against a variance was arbitrary, capricious or patently unreasonable.

III.
The minority member stated his reasons for voting against the variance as follows:
"* * * I voted against the application by Dixon Associates to erect a bathhouse in a restricted area  R-1. I believe a variance as requested would not support the zoning ordinance."
A board of adjustment which grants a variance must specify reasons in support of its action, because a jurisdictional requisite for the exercise of its power is a finding, based upon legal evidence, tending to establish the statutory requisites which bring such power into play. However, it is not required that in denying a variance the board specify any reason in support of its action, and failure to do so does not constitute a denial of due process of law. National Lumber Products Co. v. Ponzio, 133 N.J.L. 95 (Sup. Ct. 1945).
Dixon contends that there was a valid nonconforming use of the pond for bathing and that the erection of the bathhouse is ancillary and incidental to that use. Miller made out a prima facie case by establishing that the construction of the bathhouse was prohibited by the applicable zoning ordinance provision. The burden was then on Dixon to establish that the use, though nonconforming, nevertheless existed at the time of the passage of the ordinance. Heagen v. Allendale, 42 N.J. Super. 472, 478 (App. Div. 1956). This rule comports with the policy of the law to restrict nonconforming uses because their position in the zoning scheme is to subvert rather than to support sound planning. Ibid.; Ranney v. Istituto Pontificio Delle Maestro Filippini, 20 N.J. 189, 196 (1955).
Dixon, as just noted, seeks to predicate its claim for a variance on the ground that the construction of the bathhouse *472 is incidental to the valid recreational use of the pond. But this proposition is too broad. The bathhouse is not ancillary and incidental to the use of the pond for fishing, picnicking, hunting and ice skating, even though it does contain two inside toilets. Had Dixon merely built two toilets we might be faced with a different situation. But the primary purpose of the bathhouse is to afford additional convenience for bathers, thus making swimming in the pond more desirable. If the bathhouse is ancillary and incidental to any use of the pond, that use must be swimming or bathing. Hence, the first question is whether swimming or bathing was a pre-existing nonconforming use of the pond.
The evidence clearly establishes that the pond was used primarily for fishing and not for bathing. Swimming was an extremely limited activity, engaged in only occasionally, and then only by a very few. We cannot say that the evidence was of such nature and quality that the minority member of the board acted arbitrarily, capriciously and without reason by concluding that bathing was not a pre-existing nonconforming use of the pond to which the bathhouse might attach as an incidental or ancillary use. To the argument that a change in use from fishing and picnicking to swimming is insubstantial, suffice to say that a change in use should be disapproved when there is doubt whether the change is substantial. Heagen v. Allendale, above, 42 N.J. Super., at page 482. In this connection, the Dixon plans show a proposed parking lot for cars. Every indication points to the establishment of a swimming club. We may judicially notice the increasing popular demand for such clubs, with either limited or large memberships.
With reference to the old icehouse, the boathouse and two privies, it is sufficient to point out that whatever nonconforming use had been made of these in the past has clearly been abandoned and cannot under the terms of the zoning ordinance be revitalized. In fact, all of these structures have either disappeared or fallen into complete decay.
*473 And even assuming that a nonconforming use of the pond for bathing was clearly established by the record, it does not necessarily follow that it was arbitrary to conclude that the bathhouse and its toilet facilities constituted an ancillary and incidental use to the main use. The law does not protect a nonconforming use unless it is substantially of the same kind as that to which the premises were devoted at the time of the passage of the zoning ordinance. Heagen v. Allendale, above, at page 480. When there is doubt as to whether an extension of a use is substantial, the extension should be disapproved. Martin v. Cestone, 33 N.J. Super. 267, 271 (App. Div. 1954). Reasonable men might differ as to whether the bathhouse is a substantial extension of the use of the pond for bathing. The record does not compel the conclusion that under the circumstances it would be arbitrary and capricious to conclude that the bathhouse is such a substantial extension. See Heagen v. Allendale, above, and cases cited therein.

IV.
Dixon argues that a variance should be granted for its bathhouse under either N.J.S.A. 40:55-39(c) or (d). The first question which arises is whether the structure is located in a district restricted against a bathhouse. If it is, relief permitting the use can be had only under (d), and this by the express terms of the Zoning Act, N.J.S.A. 40:55-39(c), (d); Bern v. Fair Lawn, 65 N.J. Super. 435, 444 (App. Div. 1961). A reading of the township zoning ordinance clearly indicates that bathhouses are prohibited in R-1 residence districts. Hence, Dixon cannot obtain relief under (c). In any case, it failed to establish that its property meets any of the physical conditions set out in (c) as a prerequisite for the grant of a variance, or that undue hardship would result from a denial.
N.J.S.A. 40:55-39(d) permits a board of adjustment to recommend, in particular cases and for "special *474 reasons," the grant of a variance to allow a structure or use in a district restricted against such structure or use. The prevailing view of the Supreme Court is that any or all of the zoning desiderata mentioned in R.S. 40:55-32, particularly the promotion of the general welfare of the community as a whole, may constitute the foundation for a "special reasons" variance under (d), provided, however, that the "negative criteria" set out at the end of that section are also found satisfied. Bern v. Fair Lawn, above, at page 447, and cases cited.
The record does not indicate that the proposed variance will further the general welfare of the community as a whole. See Andrews v. Ocean Twp. Board of Adjustment, 30 N.J. 245, 251 (1959). And although hardship may constitute a special reason under N.J.S.A. 40:55-39(d), Andrews, at pages 250-251, and the degree of hardship which must be shown to obtain a variance under (d) is less than that required under (c), there is no evidence that Dixon will suffer any hardship if it is not granted the requested variance.
In short, the record before us is not such that we may conclude it was arbitrary and unreasonable for the minority member to find that a grant of the variance would not be supported by any of the affirmative zoning purposes set forth in R.S. 40:55-32. Nor can it be said that it would be arbitrary and unreasonable to conclude that the "negative criteria" set out at the end of that section had not been satisfied.
The judgment below must be affirmed. The stay issued by this court will be continued until such time as Dixon Associates, Inc. is foreclosed from further appellate remedies.